UNITED STATES, Appellant

v.

Charles E. MANUEL, III, Staff Sergeant
U.S. Air Force, Appellee.

No. 94–5008.
CMR No. 30025.

U.S. Court of Appeals for
the Armed Forces.

Argued May 17, 1995.

Decided Sept. 29, 1995.

For the Accused: *Captain Del Grissom* (argued); *Colonel Jay L. Cohen* and *Captain Eric N. Eklund* (on brief).

For the United States: *Captain Jane M.E. Peterson* (argued); *Major Jules D. Silberberg* and *Major John H. Kongable* (on brief); *Colonel Jeffery T. Infelise.*

*Opinion of the Court*

WISS, Judge:

1. In a contested trial in April 1992, a general court-martial composed of officer members at Sheppard Air Force Base, Texas, found the accused guilty of separate specifications of wrongful use of cocaine and wrongful use of marijuana, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Then, the members sentenced him to a dishonorable discharge, confinement and forfeiture of $390.00 pay per month for 2 years, and reduction to the lowest enlisted grade. The convening authority approved the sentence except for a discharge in excess of a bad-conduct discharge, but he suspended execution of confinement and forfeitures in excess of 15 months.

■■■ 2. The Court of Military Review[1] set aside[2] the conviction for cocaine use but affirmed the conviction for marijuana use. "[U]nable to determine ... the impact" of this decision upon the sentence, that court also set aside the sentence and authorized a rehearing. 39 MJ 1107, 1110 (1994). The Judge Advocate General of the Air Force then certified the following questions for our review:

---

1. *See* 41 MJ 213, 229 n. * (1994).

2. Because this action results from insufficient evidence, ¶ 31, the specification should have been dismissed.

## I

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN IT FOUND THAT THE REGULATIONS PERTAINING TO RETAINING AND PRESERVING POSITIVE URINE SAMPLES WERE INTENDED TO CONFER A SUBSTANTIAL RIGHT ON THE INDIVIDUAL TESTED.

## II

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED WHEN IT HELD THAT THE INADVERTENT DESTRUCTION OF A POSITIVE URINE SAMPLE DENIED APPELLANT EQUAL ACCESS TO ALL EVIDENCE AS PRESCRIBED BY ARTICLE 46, UCMJ, AND REQUIRED EXCLUSION OF THE POSITIVE LABORATORY TEST ON THE SAMPLE.

3. We answer both certified questions in the negative. Regarding Issue I, we hold that the court below was correct in holding that regulations confer a substantial right on the accused to have the Government retain and preserve his allegedly positive urine sample and to have the Government test his urine sample reliably and with due diligence. Regarding Issue II, we hold that the court below did not abuse its discretion in excluding the urinalysis results as a remedy under the circumstances of this case for the Government's gross negligence in destroying the accused's urine sample.[3]

## I

4. The accused randomly was selected to provide a urine specimen for drug testing on October 4, 1991. The sample was sent to the Air Force Drug Testing Laboratory (AFDTL) at Brooks AFB, Texas. It "tested positive for the cocaine metabolite benzoylecgonine three times—twice using the radioimmunoassay [(RIA)] screening procedure and then once using the gas chromatography/mass spectrometry [(GC/MS)] confirma-

tion procedure." The sample presented a relatively low level of metabolite, 242 ng/ml, but above the Department of Defense cutoff level of 150 ng/ml. The accused was notified of the test results during November 1991.

5. Defense counsel asked for a government retest of the urine sample in early March 1992. He did so for three purposes: to evaluate once again for the cocaine metabolite benzoylecgonine; for the first time to test for ecgoninemethylester in order to determine if there had been adulteration of the sample with raw cocaine; and finally to conduct a blood secretor test to determine if the sample matched the accused's blood type. A secretor test can detect a mismatch in a secretor status or blood type in urine and might establish that the urine sample that had been tested did not come from the accused. On March 12, 1992, however, the convening authority denied the request for retesting.

6. On March 31, 1992, defense counsel again attempted to obtain a retest of the urine sample. This time, the defense asked the Government to send the urine sample to a private laboratory for analysis by an expert at the accused's own expense. On April 1, 1992, the Government responded that they could not comply with this request because his sample had been destroyed.

7. At trial, the defense moved to suppress the results of the urinalyses of the discarded sample on the basis that he had been denied his right under Article 46, UCMJ, 10 USC § 846, to an "equal opportunity to obtain ... evidence." Although the written motion to suppress did not urge the legal theory presented in Certified Issue I, civilian defense counsel in argument at trial did assert that the Government had "disregarded their own rules which was that they keep it [the accused's urine sample] for one year, one year, unless there is an extension requested and there has to be written approval to destroy it. So they have violated their own procedures in doing this."

---

**3.** Although the second certified issue might be read to suggest that the decision below *requires* suppression of the urinalysis evidence as a remedy, we do not read the decision to say that and, so, construe the certified issue to ask whether the court below erred by concluding in its discretion that suppression was an appropriate remedy under the circumstances of this case.

8. The prosecution presented detailed evidence in an attempt to explain the destruction of the urine sample. An official report of investigation into this matter concluded that it was impossible to reconstruct with certainty the circumstances surrounding the disappearance of the accused's sample. A probable explanation was that it had been "used in a 'special study' to evaluate an alternative drug screening method," 39 MJ at 1108, and that, thereafter, a laboratory employee inadvertently had destroyed it in December 1991 as part of a group of negative samples that were approved for destruction. Dr. Arvind Modak, Chief of Professional Services and Deputy Chief of Forensic Sciences at AFDTL, testified that the destruction of the sample could be termed "grossly negligent."

9. The military judge made detailed findings of fact surrounding the destruction of the accused's sample, as follows:

Sometime around 18 December 1991, about one month after the accused's sample had tested positive, these seven specimens [the accused's and six other positive specimens] were used in a series of "special studies" to evaluate screening methods that might serve as an alternative to the RIA method.

Following these special studies, the seven specimens were inadvertently placed in a tray with negative samples that had been cleared for destruction. These specimens, including the accused's sample, were destroyed.

There was in existence at the time of these events an AF Drug Testing Laboratory Operating Instruction, which requires, among other things, that all confirmed positive samples will be frozen and maintained for at least one year. Because of error by laboratory personnel, this portion of the operating instruction was not complied with in this case.

The error by lab personnel in destroying the accused's sample occurred in December 1991, and was not discovered until March 1992 when lab personnel began searching for the sample as part of litigation preparation.

No one deliberately destroyed the accused's sample in order to hamper the defense requests for retesting. It had already been destroyed, although that fact was unknown, over two months prior to the first request for retest.

No government representative or laboratory employee acted in bad faith with regard to the accused's urine sample.

The court concludes that the defense has not established any exculpatory value in the materials that were inadvertently destroyed. There was no bad faith by the Government. The accused's rights may be adequately protected when there is a chance to attack the reliability of the testing procedures and an opportunity to examine testing personnel. The defense may present the matters raised in this motion to the fact finder as circumstantial evidence going to the reliability of the testing procedures.

The motion is denied.

(Citations omitted.)

10. Notwithstanding the accused's argument about a violation of regulations, the military judge did not address whether urine-collection regulations conferred a right on him. He was convicted based solely on evidence of urinalysis results. On appeal, he renewed his argument that the Government had not followed its own regulations and asserted that he was denied rights under Department of Defense (DoD) Directive 1010.1 (December 28, 1984); Air Force Regulation (AFR) 160–23 (July 31, 1986); and an AFDTL operating instruction that requires retention of a positive urine specimen for a specified number of days (between 60 days and one year).

11. The Court of Military Review, addressing the accused's argument for the first time, held that the government directive and regulatory standard for retaining and preserving positive urine samples "was intended to confer a substantial right for the individual tested" (39 MJ at 1110) and to assure reliability in the urine testing procedures. Finding that the premature destruction of the accused's urine sample arose from a lack of due diligence, the court below concluded that

the appropriate remedy, under all the circumstances of this case, was exclusion of the positive urinalysis results.

12. Before this Court, the Government presents the following arguments regarding the two certified issues. As to Issue I, the Government asserts in the alternative: First, "there is no legal authority or factual basis for" the Court of Military Review's holding that the applicable directive and regulatory standard for retaining and preserving positive urine samples "was intended to confer a substantial right on the" servicemember. Government's Final Brief at 8. Second, even where the regulation violated by the Government is meant at least in part to benefit an accused, absent a showing of prejudice, the violation will not serve as a bar to prosecution. Final Brief at 9–11. Regarding Issue II, as there was neither bad faith by the Government nor proof that the discarded evidence was exculpatory, there was no violation of due process, so suppression of the test results was an inappropriate remedy in this case. Final Brief at 12–15. We address each of the certified issues and these arguments seriatim.

## II

13. The administration of military justice is rooted in inherent fair play and justice that prevail under the Anglo–American system of law. "[I]n defining the rights of military personnel, Congress was not limited to the minimum requirements established by the Constitution, and in many instances, it has provided safeguards unparalleled in the civilian sector." *United States v. McGraner*, 13 MJ 408, 414 (CMA 1982). *See, e.g.*, Gilligan, *The Bill of Rights and Service Members*, The Army Lawyer 3 (Dec. 1987) (servicemembers' rights broader than constitutionally required). The broad constitutional rights that servicemembers enjoy spring from the fundamental principle that they do not lay aside the citizen when they assume the soldier.

> [M]embers of the military are not shorn of their constitutional rights while they remain in the military service. Blackstone said: '... he puts not off the citizen when

he enters the camp; but it is because he is a citizen, and would wish to continue so, that he makes himself for a while a soldier.' [1 Blackstone, Commentaries (Wendell ed), page 408.]

*United States v. Culp*, 14 USCMA 199, 206, 33 CMR 411, 418 (1963).

14. Another golden thread in the military justice tapestry is that "either the President in promulgating the Manual for Courts–Martial or the Armed Services by adopting regulations can go even further than the Constitution and the Uniform Code in providing safeguards for military personnel." *United States v. McGraner, supra* at 414–15. Regarding these regulations, we have held that a service must abide by them where the underlying purpose of the regulation is the protection of personal liberties or interests. *See United States v. Dunks*, 1 MJ 254 (CMA 1976). More recently the Supreme Court and this Court have recognized that the Government is bound by its own regulations, especially when the regulations confer a right or benefit on an individual. *See United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. McGraner, supra*.

### A

15. The focus of Certified Issue I is whether service directives confer a right on a servicemember to have the Government retain and preserve an allegedly positive urine sample and to have the Government test the urine sample reliably and with due diligence. This is a matter of law considered *de novo*. *See id.* We are not asked here to decide if these regulations confer an absolute right on servicemembers to have urine samples retested. *Cf. United States v. Burnette*, 29 MJ 473, 475 (CMA), *cert. denied*, 498 U.S. 821, 111 S.Ct. 70, 112 L.Ed.2d 43 (1990); *see also United States v. Mosley*, 42 MJ 300 (1995); *United States v. Robinson*, 39 MJ 88 (CMA 1994).

16. In the present case, multiple directives are implicated that establish practices to insure the proper safeguarding and testing of urinalysis samples. ¶ I.2, DoD Directive 1010.1 (December 28, 1984), requires

retention of positive samples for 60 days, and ¶ I.3 extends this to 120 days when a court-martial is involved. ¶ 8d(4)(a), AFR 160–23, Drug Abuse Testing Program (31 July 1986), requires retention of a positive urine specimen for 180 days. ¶ 4b(2). AFDTL Operating Instruction 160–202, effective at the time that the accused's sample was tested, required retention of all reported positive samples for one year.

17. In *United States v. McGraner*, 13 MJ at 417–18, this Court stated several factors to consider in determining whether a directive confers a right on servicemembers. We apply that analysis here to determine if servicemembers have a right that a positive urine specimen will be retained properly and handled with due care.

■ 18. First, we observe that the regulations detail proper procedures for collecting, transmitting, testing, and handling to insure reliable evaluation of urine samples. *See United States v. Pollard*, 27 MJ 376 (CMA 1989). Meticulous attention to the details of urinalysis processing is necessary to insure a reliable test result, as the court-martial and appellate courts must closely scrutinize the urinalysis evidence, particularly where the Government proceeds on a charge alleging drug usage based solely upon evidence obtained by non-consensual methods. *See id.; United States v. Hillman*, 18 MJ 638 (NMCMR 1984). While these regulations were prescribed to help manage the handling of the specimen, they are not for the exclusive benefit of the Government. Rather, the regulations relating to retention of the urine sample guarantee an accused's Article 46 right of the opportunity to discover evidence.

19. Thus, these regulations reflect the attempt to operate the urinalysis program in a manner consistent with protections with which Congress has clothed servicemembers. *See United States v. Ruiz*, 23 USCMA 181, 48 CMR 797 (1974). They increase confidence of servicemembers in a fair testing process, which is a cornerstone of legitimacy for the urinalysis program. *Cf. United States v. McGraner*, 13 MJ at 417. We consider that the retention requirement is not merely for management purposes but is also to protect the statutory right of each servicemember's access to evidence.

■ 20. Second, although the regulations do not grant to the servicemember any specific remedy because of the Government's failure to meet a standard, deviations from them are significant and will be considered in determining if the urinalysis evidence lacks sufficient reliability to be considered. *See United States v. Pollard, supra.* ¶ 18. While we are mindful that exclusion of the evidence is a drastic remedy, we also recognize that it is possible to maintain morale only where a urinalysis program is free of gross negligence in the handling of specimens. Every servicemember must have confidence in the urinalysis program, and this confidence is based in part on the knowledge that each urine specimen is properly handled and reliably tested.

■ 21. Accordingly, there is considerable discretion for courts to fashion a remedy to address any deviation from regulatory testing procedures. *See id.*; RCM 907, Manual for Courts–Martial, United States, 1984. Where a lower court finds gross negligence in the handling of a urine sample and a significant violation of regulations intended to insure reliability of testing procedures, we will not require an accused to make a further demonstration of specific prejudice before we sustain the remedial relief fashioned by a lower court in the exercise of its discretion.

■ 22. Finally, we consider that an important and distinguishing feature of this case is that the Court of Military Review has construed its service regulation to provide this protection to the accused. This is another situation where the views of the service courts deserve some deference. *See United States v. Moultak*, 24 MJ 316 (CMA 1987); *United States v. Johanns*, 20 MJ 155 (CMA), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985). The Court of Military Review considered that the regulatory standard was intended to confer a substantial right for the servicemember. Such an interpretation is persuasive, and we do not per-

ceive anything requiring a different conclusion.

## B

23. Having recognized the accused's right, we must now address the consequence and remedy for the Government's disregarding that right. The Government is correct that the two-part test announced in *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984), states both the constitutional and the military standards of due process relating to preserving evidence that is not "apparently" exculpatory. *United States v. Kern*, 22 MJ 49 (CMA 1986). In that context, it is the accused's burden "to show that the evidence possessed an exculpatory value that was or should have been apparent to the Government before it was lost or destroyed and that he is unable to obtain comparable evidence by other reasonably available means." *Id.* at 51–52.

24. The constitutional due process protection and the Article 46 right to discovery, however, are not the only rights implicated here. The result of the Government's disregard of accused's right to proper handling of his urine sample is that he is denied access to lost evidence.

25. The President in the Manual for Courts–Martial specifically has addressed an accused's right to access unavailable evidence. RCM 703 states:

(f) *Right to evidence.*

* * *

(2) *Unavailable evidence.* Notwithstanding subsection (f)(1) of this rule, a party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process. However, if such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of

or could have been prevented by the requesting party.

26. This provision is illustrative of the President's going even further than the Constitution and the Uniform Code in providing a safeguard for military personnel. This rule gives the court *discretion* to fashion an *appropriate* remedy if lost "evidence is of such central importance to an issue that it is essential to a fair trial."

27. In the present case, as the military judge failed to address the issue of whether the regulatory standard was intended to confer a substantial right on the servicemember, the judge naturally did not address a remedy for the disregard of this right. Instead, it was the Court of Military Review that initially addressed both of these issues and concluded that suppression of the urinalysis results was the appropriate remedy. We review the decision of that court for an abuse of discretion. *See United States v. Kern, supra.* ¶ 23.

28. As the urinalysis result was the only evidence of the accused's wrongful use of cocaine, the urine sample was of central importance to the defense. We consider it most significant that in this case there was a complete lack of accountability for the urine sample. The Government at best could present only a probable explanation that the sample was used in a special study to evaluate an alternative drug-screening method and that a laboratory employee discarded it. There was no evidence presented to document this disposition. The expert from the laboratory characterized the loss of the accused's sample as "gross negligence." We accept his evaluation of this situation and believe that, whatever the mishandling of the urine sample, this gross negligence undermined the reliability of the urinalysis results.

29. Loss of this evidence was particularly significant here, as there was a genuine controversy as to nanogram level in the specimen. The initial reading was close to the 150 ng/ml cutoff. The accused testified on the merits, and he denied using cocaine and stated that he did not have any explanation for his positive urine samples. He established a

sincere desire for an independent-expert test, and his attempt to obtain a retest was not perfunctory. Indeed, he offered to pay for the tests at his own expense.

30. In contrast with *United States v. Robinson*, 39 MJ at 89, where Robinson stipulated that "there were no apparent" irregularities "in the collection, handling, or testing" of his sample, this accused challenged all the procedures involved. This case is similar to the situation in *United States v. Harper*, 22 MJ 157 (CMA 1986), where there were questions raised about the "security and integrity of samples tested," and the military judge accordingly continued the case to permit a retest by the defense expert and a "secreter test." 22 MJ at 160 and n. 3. Here, but for the destruction of the urine sample, the military judge could have afforded the right to an *independent test* to the accused. *Cf. United States v. Mosley*, 42 MJ 300 (1995). In the narrow facts of this case, we find that the accused raised a viable issue as to the accuracy of the urinalysis results. To require more would place an insurmountable burden on an accused.

31. The linchpin of analysis regarding Issue II, therefore, is the standard of review, as the determination of an appropriate remedy for loss or destruction of evidence is left to the lower court's discretion. *See United States v. Kern, supra.* We need not decide whether the Court of Military Review was required as a matter of law to suppress the evidence; nor do we hold that suppression is the appropriate legal remedy in all instances of lost or destroyed evidence. Rather, we hold only that the Court of Military Review did not abuse its discretion by following that course of remedial action here.[4] *See United States v. Mosley, supra; cf. United States v. Pollard, supra* (¶ 18). As evidence of the urinalysis was excluded, there was no other evidence to prove the cocaine-use offense. Accordingly, the Court of Military Review properly set aside the finding of that specification and ordered a sentence rehearing.

[4] The record is unclear as to whether the Government knew that the test sample was missing when it denied the accused's initial request for a retest. The record does capture the curious situation of the accused's persistence in requesting a retest resulting in the ultimate disclosure that the sample had been lost prematurely. We have evaluated this issue, however, assuming that there was no attempt by the Government to mislead the defense.

## III

The certified questions are answered in the negative.

The decision of the United States Air Force Court of Military Review setting aside the conviction for cocaine use and the sentence is affirmed. Specification 1 of the Charge is dismissed.

Chief Judge SULLIVAN and Judges COX and GIERKE concur.

CRAWFORD, Judge (dissenting):

32. If the majority want to hold that they will not permit a prosecution based upon a urinalysis where the sample, which has tested positive on three occasions, has been lost through no bad faith by the Government, they should simply say so. The majority (1) apply facts not in the record, (2) reject the history behind the Uniform Code of Military Justice and Manual for Courts–Martial, (3) reject precedent, and (4) fail to apply a harmless-error analysis.

33. It is untenable when a chain of custody is intact, a sample is tested positive three times, and then the sample is lost without any bad faith on the part of the Government, that the majority could conclude that a "use of cocaine" specification should be dismissed. But that is what has happened here. This is not a case where the Government has intentionally destroyed exculpatory material. If it were, I could agree with the majority.

34. Rather, this case and others appear to evidence a distrust of the urinalysis program *en toto;* an outlook that disregards the tools available to advocates to thoroughly test the program. *See, e.g., United States v. Fisiorek*, 43 MJ 244 (1995) (urinalysis); *United States v. Sztuka*, 43 MJ 261 (1995) (same); *United States v. Nimmer*, 43 MJ 252 (1995) (same); *United States v. Moseley*, 42 MJ 300 (1995) (same); *United*

*States v. Robinson*, 39 MJ 88, 90 (CMA 1994) (Cox, J., dissenting) (same). The social cost of the majority's holding and its impact on the security and fitness of our military units may eventually have an adverse effect on our national security. This outcome is a reminder of bygone days when this Court permitted military inspections but incredibly refused to allow "the fruits" of those inspections to be used "as evidence in a criminal or quasi-criminal proceeding." *United States v. Roberts*, 2 MJ 31, 34 (1976).

35. The majority seem to rest their opinion on notions that "we may well be the only jurisdiction which permits" convictions "based solely" on urinalysis testing,[1] *United States v. Mack*, 33 MJ 251, 256 (CMA 1991) (Cox, J., dissenting); that positive urinalyses ensure convictions;[2] that the military is the only jurisdiction that prosecutes "use";[3] and that there are no tools available for the defense to rebut a positive urinalysis.[4] All of these assumptions are factually inaccurate.

### (1) Finding "Gross Negligence"

36. I specifically disagree with the finding of fact by the majority. They find that the Government acted with "gross negligence in destroying the accused's urine sample." ¶¶ 3 and 28. The prosecution's direct examination of Dr. Modak on the motion to suppress was as follows:

Q: And then is it your opinion that the situation we are in now was due to an inadvertent mistake?

A: That is correct because we have not only this specimen but we have six more specimens which were also, you know, disposed of inadvertently along with this specimen.

On cross-examination as to the loss of the seven samples, which were all listed in one document, the defense asked:

Q: Would you agree, doctor, that losing seven positive results, placing them in a negative position, would be grossly negligent on the part of whoever did it?

A: Well it is negligent, no doubt about it, yes.

Q: Not only negligent, doctor; it would be grossly negligent, wouldn't it?

A: Well, if you want to characterize it that way, yes.

Referring back to the earlier testimony, but this time with the members present, the defense asked Dr. Modak:

Q: Now you referred to the throwing away, the destruction of the urine specimens that was ostensibly my client's as an inadvertent mistake. Now earlier in the hearing today we talked about it in terms a little more different than that, didn't we? We talked about it in terms of being grossly negligent, did we not?

A: Well, you can [c]all it that.

Q: That is what you called it this morning, didn't you?

A: Yes, it is negligent, no doubt about it.

Q: So whoever was the lab tech or the technician or whoever was running this thing, when they destroyed that frozen sample, then that was a bad mistake?

A: Yes, it was.

37. To convert these exchanges to a finding of gross negligence by this Court is unwarranted. The military judge found there

---

1. *But see State v. Santeyan*, 136 Ariz. 108, 664 P.2d 652 (1983) (2 urinalysis tests obtained from defendant during treatment in hospital admitted in evidence over objection—reversed because performed during treatment and thus privileged); *State v. Blackwell*, 809 P.2d 135 (Utah App.1991) (conviction of several offenses, including possession of a controlled substance; urinalysis admitted to bolster evidence of possession of methamphetamines [found in his possession]).

2. The U.S. Army Clerk of Court's records show the acquittal rates for use of a drug for fiscal year 1993 was 60 percent and, 1994, 52 percent.

3. *See, e.g., Morales v. United States*, 344 F.2d 846 (9th Cir.1965) (rejected, *inter alia*, defendant's argument that California "use" statute as applied to him was violative of the Fourteenth Amendment); *State v. Olea*, 182 Ariz. 485, 491, 897 P.2d 1371, 1377 (App.1995) (upheld conviction for drug use and did not find "use" statute void for vagueness); *People v. Jones*, 189 Cal.App.3d 398, 405, 234 Cal.Rptr. 408, 413 (1987) (defendant convicted of use of heroin via urinalysis results as well as injection marks).

4. *See, e.g.,* K. Zeese, *Drug Testing Legal Manual* (1995); E. Imwinkelried, *The Methods of Attacking Scientific Evidence* (2d ed. 1992).

was no bad faith, and the court below found "a lack of due diligence in the care of this important evidence." 39 MJ 1107, 1110 (1994). Neither of these, however, can be equated to "gross negligence," in my judgment.

### (2) Code and Manual

38. In addition to disagreeing with the majority's factual findings, I also disagree with their discussion concerning the Uniform Code, the Manual for Courts–Martial, and the Constitution.

39. The Supreme Court of the United States has said that "[a] court's duty to enforce an agency regulation is most evident when compliance with the regulation is mandated by the Constitution or federal law." *United States v. Caceres,* 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979); *see also United States v. McGraner,* 13 MJ 408, 415 (CMA 1982) (following *Caceres* rationale).

40. Based upon what I believe is a misapplication of Article 46, Uniform Code of Military Justice, 10 USC § 846 ("the statutory right of . . . access to evidence") (¶ 19) and RCM 703(f)(2), Manual for Courts–Martial, United States, 1984, the majority conclude that courts have considerable *"discretion* to fashion an *appropriate* remedy if lost 'evidence is of such central importance to an issue that it is essential to a fair trial.'" ¶ 26. But the majority have applied this discretion only to the now Courts of Criminal Appeals. ¶ 2 n. 1.

41. Misreading Article 46 and RCM 703 to find a substantial right worthy of protection is to ignore the role of the Rules for Courts–Martial in the hierarchy of military authority as well as to ignore the history behind Article 46 and RCM 703 in particular. RCM 703 is entitled: **Production of witnesses and evidence.** The specific provision cited by the majority, RCM 703(f), is based on ¶ 115*a* and *c,* Manual for Courts–Martial, United States, 1969 (Revised edition), and *United States v. Toledo,* 15 MJ 255 (CMA 1983). *See* Drafter's Analysis of RCM 703(f), 1984 Manual, *supra* at A21–36.

42. Paragraph 115*a,* 1969 Manual, *supra,* provided for attendance of witnesses and set forth procedures for requesting witnesses. In fact, this paragraph was amended based on the cases from this Court requiring the attendance of witnesses. Para. 115*a,* Analysis of Contents, 1969 Manual, *supra* at 23–1 (Dept. of the Army Pamphlet 27–2, July 1970).

43. Paragraph 115*c* provided for disclosure of certain documents or other evidentiary material in the "custody and control of military authorities." Again this was amended based on decisions from this Court construing "use" of documents and evidence in the control of the military. *Id.* It is certainly a stretch of the Manual to give the intermediate appellate court the ability to suppress evidence based on loss of a sample that was tested three times and each time found to contain cocaine.

44. Article 46 does not justify the majority's position either. Article 46 provides as follows:

The trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe. Process issued in court-martial cases to compel witnesses to appear and testify and to compel the production of other evidence shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue and shall run to any part of the United States, or the Territories, Commonwealths, and possessions.

45. At the time the Uniform Code of Military Justice was drafted, there was a question as to application of the Bill of Rights to servicemembers. *Compare* Henderson, *Courts–Martial and the Constitution: The Original Understanding,* 71 Harv.L.Rev. 293 (1957), *with* Wiener, *Courts–Martial and the Bill of Rights: The Original Practice* I and II, 72 Harv.L.Rev. 1 and 266 (1958). Thus, Congress ensured servicemembers were accorded the privilege against self-incrimination: Art. 31, UCMJ, 10 USC § 831; the right of confrontation and compulsory process: Art. 46; the right to counsel: Art. 27, UCMJ, 10 USC § 827; protection against

double jeopardy: Art. 44, UCMJ, 10 USC § 844; and protection against double punishment: Art. 63, UCMJ, 10 USC § 863 (1983).

### (3) Precedent

### (A) Constitution

46. The majority misapply precedent from this Court and the Supreme Court. It is interesting to contrast this case with *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

47. Justice Marshall asserted in *Trombetta:* "The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence." He said that the duty to preserve evidence is "limited" to that which is "expected to play a significant role in the suspect's defense." 467 U.S. at 488, 104 S.Ct. at 2533. To meet the constitutional standard, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. at 2534. While apparent exculpatory value is not defined, it is certainly hard to understand how thorough positive tests satisfy any definition of that term.

48. Much of the uncertainty surrounding the standard in *Trombetta* was clarified in *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). *See also United States v. Mobley*, 31 MJ 273 (CMA 1990) (following the *Youngblood* bad-faith standard). The Arizona appellate court reversed Youngblood's conviction on charges of child molestation, sexual assault, and kidnapping based on the state's failure to properly "preserve semen samples from" the 10–year old victim's body and clothing. The state appellate court noted that "it did 'not imply any bad faith on the part of the State,' " but still reversed the conviction. 488 U.S. at 55, 109 S.Ct. at 336. It reasoned: "[W]hen identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator, such

loss is material to the defense and is a denial of due process." *Id.* at 54, 109 S.Ct. at 335, quoting 153 Ariz. 50, 734 P.2d 592, 596 (1986).

49. This state court decision, however, was reversed by the Supreme Court, which made clear in *Youngblood* that proof of negligence is not enough to satisfy the bad-faith standard. The Chief Justice stated that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58, 109 S.Ct. at 337.

50. Further, in a footnote in *Youngblood*, the Court emphasized that the police did not know that the evidence would have exculpated the defendant at the time they failed to preserve the evidence. The Court concluded: "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n. *, 109 S.Ct. at 336 n. *. In summary, *Youngblood* requires the defendant to prove that the evidence was exculpatory and that the Government knew it was. Neither of these factors is present in this record.

51. Justice Stevens, concurring in the *Youngblood* judgment, noted that the police interest in preserving evidence is just as strong or stronger than that of the defendant. *Id.* at 59, 109 S.Ct. at 338. Justice Stevens also asserted how "unlikely" it was that the accused was prejudiced because the defense had an opportunity to explain how the State failed to preserve the evidence and to argue how the evidence could have exonerated him. *Id.* at 59, 109 S.Ct. at 338. Moreover, the jury was instructed: "If you find that the State ... allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest." *Id.* at 59–60, 109 S.Ct. at 338. Requesting such an instruction was one of the options available to the accused in this case. *See State v. Lang*, 463 N.W.2d 648 (N.D.1990). The instruction may even be required under some instances.

*State v. Janda,* 397 N.W.2d 59 (N.D.1986); *see also United States v. Kern,* 22 MJ 49, 52 (CMA 1986).[5]

52. Prior to the *Youngblood* decision, this Court, in applying *Trombetta,* indicated in *Kern* that remedial action, including dismissal, should only be undertaken "where bad faith is clearly demonstrated." 22 MJ at 52.

53. As in *Youngblood,* the defense in *Kern* was allowed to argue that destruction of the evidence was circumstantial evidence that there may have been an imperfect chain of custody, thus undermining a link with that accused or raising an inference of improper testing. The defense also argued that all they could do was have a retest, but they were denied that opportunity. It was the loss of the urine sample that allowed the defense to argue that this laboratory could not be trusted.

54. By rejecting our own as well as Supreme Court precedent which requires a showing of bad faith, the majority fail to recognize why the bad-faith standard has been set forth in the first place. This standard reflects the logical incentives involved in the preservation of evidence. After a sample has been tested three times with positive results each time, there is no incentive or the slightest reason for the Government to destroy the evidence. In fact, I am certain that the Government would have been more than happy to have the defense test the evidence. Of course, the contrary incentive would apply if any or all three tests had been negative. Thus, one realizes why the Supreme Court has required a showing of bad faith.

55. There are many instances pertaining to a trial when facts cannot be reconstructed, but the remedy is not exclusion. Examples include situations such as where a defense counsel is unable to attend a lineup or where a drunk driver submits to a breathalyzer but no video or tape recording is made of the event. The remedy is a thorough examination of the evidence surrounding the result rather than exclusion of the evidence.

### (B) Regulations

56. This Court has echoed this conclusion in prior cases. In *United States v. Johnston,* 41 MJ 13, 16 (1994), this Court stated:

> [A] violation of [a] DoD Directive should not lead to exclusion of the evidence.... We specifically reject the view that this Court has carved out a special exception for urinalysis test results that would determine admissibility based upon DoD and service directives rather than the Military Rules of Evidence.

Implicit in this language is the view that exclusion was not necessary because no substantial right was implicated.

57. We came to a similar conclusion in deciding that a pretrial delay which violated Air Force rules for processing charges did not warrant dismissal of the charges. *United States v. McGraner,* 13 MJ at 417. In *McGraner,* the Court noted that (1) the regulation did not grant the remedy sought; (2) "the time standards were prescribed primarily for 'management' purposes, rather than to protect the rights of accused persons"; (3) dismissal is a "drastic remedy" which the Supreme Court has said to use sparingly (*United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)); (4) there was no reliance on the standards in the regulations, and (5) the "guidelines were not promulgated in order to implement" defendant's "speedy trial or due process rights or to provide specificity to some general standard ... in the Constitution, the Uniform Code, or the Manual for Courts–Martial." 13 MJ at 417–18.

58. Other courts have also chosen not to apply the exclusionary rule when deciding cases where a governmental regulation, or in some cases even a statute, has been violated. *See, e.g., In re Shain,* 978 F.2d 850 (4th Cir.1992) (reporter's attempts to quash subpoenas must fail despite Department of Justice failure to follow regulations); *United States v. Nuth,* 605 F.2d 229, 233–34 (6th Cir.1979) (evidence obtained by IRS in viola-

---

5. In fact the defense could have requested an instruction based on the loss of the evidence, which would say that the court members may infer that the test would have been unfavorable to the Government if no reasonable explanation was given for the loss. *See State v. Lang,* 463 N.W.2d 648 (N.D.1990).

tion of agency rules requiring warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), should not be suppressed); *accord United States v. Snowadzki*, 723 F.2d 1427, 1430–31 (9th Cir.), *cert. denied*, 469 U.S. 839, 105 S.Ct. 140, 83 L.Ed.2d 80 (1984); *United States v. Holsworth*, 7 MJ 184, 186 (CMA 1979) (exclusionary rule not applied to evidence seized during premature random inspection made in violation of Air Force regulations); *People v. Martinez*, 898 P.2d 28, 31–33 (Colo.1995) (evidence obtained from extrajurisdictional search not suppressed because no deprivation of constitutional right); *Pennsylvania Steel Foundry & Machine Co. v. Secretary of Labor*, 831 F.2d 1211 (3d Cir.1987) (declined *to apply exclusionary rule to evidence obtained in violation of OSHA regulations*); *United States v. Hensel*, 699 F.2d 18, 29 (1st Cir.) ("lack of statutory authority and the contravention of a regulation do not automatically invoke the exclusionary rule"), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *United States v. Mangieri*, 694 F.2d 1270, 1284 n. 15 (D.C.Cir. 1982) (suppression may not be appropriate remedy "[e]ven if the government had violated a statute").

59. Notably, in *United States v. Pollard*, 27 MJ 376 (CMA 1989), citing *Caceres*, ¶ 39, we specifically considered the urinalysis program and held that:

> deviating from a regulation or instruction which sets out procedures for collecting, transmitting, or testing urine samples does not render a sample inadmissible as a matter of law; however, such deviation may be considered along with all other factors in determining if the evidence lacks sufficient reliability to be considered by the finders of fact.

27 MJ at 377.

#### (4) Harmless Error

60. While Article 59(a), UCMJ, 10 USC § 859(a), specifically prohibits reversal for harmless error, the majority does not even discuss that concept. Article 59(a) provides: "A finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Here there was no prejudice in fact. Period. The three tests that were performed all tested positive. The fact that another test *might* have tested negative is not a ground for reversal. In effect, one might argue that *Youngblood* is too broad in one sense because it seems to provide for imposition of a sanction even though no prejudice was shown.

#### Conclusion

61. What the majority appear to be doing is invoking their supervisory authority to reject the bad-faith requirement. Inherent in the majority's opinion is the view that a bad-faith showing is too difficult to prove, and fundamental fairness requires dismissal of the charges when a regulation gives a defendant a right to retesting. The majority insist on this remedy even though the defense had the opportunity to present the issue of the lost sample to the factfinders and to argue and draw inferences against the Government's interests as well as to request available instructions. I suggest that in the long run the defense is better off without the opportunity to retest the lost evidence. And that, of course, is the rationale behind the *Youngblood* requirement for a bad-faith standard.

62. The majority make no distinction between government culpability and the nature of the evidence excluded. Yet, the Supreme Court has indicated that, where perjured evidence which obviously impacts on the truth-seeking process is presented, then the sanction is more severe than where the evidence is only speculatively exculpatory. *United States v. Mezzanatto*, —— U.S. ——, ——, 115 S.Ct. 797, 803, 130 L.Ed.2d 697 (1995); *Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980). Here, three tests have shown that the evidence in question is strongly incriminating. Any analysis in this case as to the exercise of discretion must include an examination of harm to the defendant. There was NONE!

63. In effect, suppression of this evidence penalizes the wrong parties. The impact of

the majority's decision may well be elimination of the regulation's requirement that samples be held for testing. I hope not.

64. In conclusion, I suggest that, rather than requiring dismissal of the charges, the Court should assess the prior results, the potential error rates, and the challenges made to the collection, transportation, and testing of the evidence. This will give the Court a proper focus on the key issues.[6] *Youngblood* suggests an approach that allows options or sanctions for a defendant's use where the evidence is not excluded. Here, there is no discussion by the majority of the many alternatives available to the defense. Surely, a more rigorous analysis is required before reaching the result obtained by the majority.

65. Foremost, this case is an unwarranted extension of *Mosley*. *Mosley* was designed so that neither the convening authority nor the intermediate appellate court could reverse a military judge unless there was an abuse of discretion by that judge. This is a case of discretion run amuck. We have consistently asked military judges to set forth reasons for their rulings as well as to consider the alternatives or the factors involved. Here, that was done, but both the Court of Military Review and this Court chose to ignore that effort. For all these reasons, I must dissent from any confirmation of the flawed analysis by the court below.

6. *See* n. 4, *supra.*