UNITED STATES, Appellee,

v.

Robert S. NADEL, Sergeant, U.S. Marine Corps, Appellant.

No. 97–0804.

Crim.App. No. 95–0467.

United States Court of Appeals for the Armed Forces.

Argued May 14, 1998.

Decided Sept. 14, 1998.

For Appellant: *Thomas G. Macauley* (argued); *Anthony W. Clark* and *Lieutenant John D. Holden,* JAGC, USNR (on brief); *Lieutenant Steven B. Fillman,* JAGC, USNR.

For Appellee: *Lieutenant Kevin S. Rosenberg,* JAGC, USNR (argued); *Colonel Charles Wm. Dorman,* USMC, and *Commander D.H. Myers,* JAGC, USN (on brief); *Major Stephen Finn,* USMC.

*Opinion of the Court*

EVERETT, Senior Judge:

Contrary to his pleas,[1] appellant Nadel was convicted by a military judge sitting alone as a special court-martial of two specifications of indecent assault and one specification of indecent exposure, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The sentence adjudged was a bad-conduct discharge, 35 days' confinement, forfeiture of $554 pay per month for 2 months, and reduction in grade to E–1. The convening authority approved the adjudged sentence; thereafter the Court of Criminal Appeals affirmed the convictions and sentence. 46 MJ 682 (1997).

We granted review as to this issue:

WHETHER THE TRIAL COURT SHOULD HAVE SUPPRESSED THE EVIDENCE SUPPORTING APPELLANT'S CONVICTION BECAUSE THE ONGOING INVESTIGATION OF AP-

---

1. Nadel initially entered conditional pleas of guilty; but the military judge refused to accept such pleas because he did not believe the issues raised by appellant's pretrial motions were "case dispositive." Thereupon, pleas of not guilty were entered.

PELLANT VIOLATED DEPARTMENT OF DEFENSE INSTRUCTION 5505.8.[2]

## I

Sergeant Nadel met Lance Corporal (LCpl) Michael A. Timperio in March 1994 during a training exercise when they were both stationed on Okinawa. A few weeks later, Timperio accepted appellant's invitation to accompany Nadel and a few friends for some partying. Later that day, Nadel came to Timperio's barracks room and stated that his friends would not be joining them. Timperio, who had already drunk a few beers, asked Nadel to drive him to an ocean-side location, where a training accident had recently occurred. When they arrived near dusk at the rather isolated site, Nadel requested Timperio to rub his shoulders, which Nadel said were tense. Timperio reluctantly complied and briefly moved his fingertips over Nadel's back. After commenting that Timperio was not massaging his shoulders correctly, Nadel suggested that they exchange positions. Timperio agreed.

Sitting behind Timperio, appellant began rubbing Timperio's shoulders through his shirt; shortly thereafter, he placed his hand under Timperio's shirt, then moved his hands around to the front of Timperio's torso, and finally grabbed Timperio's groin. Thereupon, Timperio pushed appellant's hand away and stated emphatically that he liked sexual contacts with women, but not with men. The rubdown resumed; and Nadel again reached under Timperio's shorts. This time he touched the base of Timperio's penis. When Timperio immediately objected, Nadel withdrew his hand; but having become sexually aroused, he then exposed his own penis and masturbated. Timperio turned his eyes away—apparently in disgust. Nadel fastened his trousers, and the two men departed for their post.

When they got back to the barracks, Timperio told Nadel "not to tell anybody" because he did not want rumors to spread that someone had touched his private parts. However, upon returning to his room in the barracks, Timperio recounted the incident to a friend. A couple of days later, he reported to his executive officer the occurrence with appellant; but Timperio told that officer that he did not "want to report it to the [Criminal Investigation Division (USMC)] CID," apparently because he feared this would delay his transfer from Okinawa.

About a week and a half later, Timperio went to Corporal Biggs, a member of appellant's unit, in order "to warn him off that you have a fag in your platoon." Biggs called over Sergeant Molder, to whom Timperio explained what had happened with appellant. Molder apparently knew that appellant was already under investigation. In turn, he contacted Timperio's first sergeant, who then contacted the unit's executive officer. The next day, Timperio was interviewed by the CID. Soon thereafter Nadel, who had already been interviewed by the CID in connection with an ongoing investigation, was reinterviewed by the CID. Although at the earlier interview, Nadel had denied any homosexual conduct or proclivity, he now confessed to the acts alleged by Timperio. This confession and Timperio's testimony were the evidence on which the Government relied at trial to establish appellant's guilt.

## II

Both at trial and on appeal, defense counsel have contended that the evidence offered by the Government as to Nadel's guilt should have been suppressed because it was obtained in violation of DoD Instruction 5505.8, which was promulgated shortly before the CID initiated its investigation of appellant. That investigation was begun because of a conversation between Nadel and LCpl Timothy L. Keeley. During that conversation, appellant offered three or four times to give Keeley a massage. According to Keeley, "[H]e kept on asking 'I want you to go back to my room. I want to give you a massage.'" Then, "He begged me at one point to go back. I said no." Because of these invitations from Nadel and some other comments, Keeley believed that appellant wished to engage in some type of homosexual activi-

---

**2.** This Instruction concerns the so-called "Don't Ask, Don't Tell" policy.

ty with him. Therefore, Keeley reported the incident to his non-commissioned officer in charge, and ultimately his report reached Major Kazin, the "acting" Camp Commander at Camp Hansen. Kazin, in turn, sent Keeley to the CID, which then launched an investigation of appellant.

Appellant insists that to commence an investigation on no basis other than Keeley's allegations violated DoD Instruction 5505.8. Since the sole evidence against Nadel at trial—namely, Timperio's testimony and appellant's own confession—was tainted by this violation, enforcement of the Instruction mandates exclusion of that evidence. According to this view, reversal is required because, if the CID had not already been conducting its illegal investigation, Timperio's allegations would never have resulted in either a CID investigation of those allegations or the preferring of charges based thereon.

Paragraph A, DoD Instruction 5505.8, which took effect on February 5, 1994,

> provides that, as a matter of investigative priorities and resource limitations, Defense Criminal Investigative Organization (DCIOs) and other DoD law enforcement organizations will normally refer allegations involving only adult private consensual sexual misconduct to the Service member's commander for appropriate disposition. To ensure their independence, objectivity, and effectiveness, however, DCIOs are authorized to initiate investigations into sexual misconduct without obtaining a referral from the member's commander; they may do so, however, only if the Director or Commander, or Principal Deputy, of the DCIO determines that there is credible information that an offense has been committed and that the expenditure of investigative resources is appropriate.[3]

In turn, "sexual misconduct" is defined as:

> A sexual act or acts in violation of . . . [the Uniform Code of Military Justice] that oc-

cur between consenting adults, in private, whether on or off a military installation. It does not include any sexual act or acts that involve allegations of force, coercion, or intimidation; abuse of position or rank; persons under the age of 16; or conduct that relates directly to applicable security standards for access to classified information.

Para. C. *Definition.*

If Timperio had been sent immediately to the CID by the executive officer of his unit when he first reported the incident with appellant, and the CID had then investigated those allegations, the defense's argument would be even less persuasive. If Timperio's account is accepted, the touching of his penis and the exposure of appellant's penis were not acts to which he consented. Thus, we assume that the indecent assaults and indecent exposure would be outside the purview of DoD Instruction 5505.8. Indeed, the "force" involved in Nadel's grabbing Timperio's penis would seem to place the indecent assault within the specific exclusions contained in the Instruction's definition of "sexual misconduct."

Timperio, however, was not sent initially to the CID and it is quite possible that, if the investigation of Keeley's allegations had not still been underway, the incident with Timperio would have been ignored. Indeed, that apparently was Timperio's own preference because he did not want to be kept on Okinawa while his allegations against Nadel were investigated.

If we consider whether Keeley's report constituted an adequate basis under DoD Instruction 5505.8 for instituting the investigation, the answer is less clear. According to Keeley's interpretation of appellant's remarks, Nadel was giving him a veiled invitation to engage in homosexual acts. Those acts, if performed, could be violations of Article 125 (10 USC § 925) or Article 134 of the Code, or both. However, the Instruction provides that investigation of such acts

---

3. This case is unlike *McVeigh v. Cohen,* 983 F.Supp. 215 (D.D.C.1998). That case involved a threatened administrative discharge based on an America Online e-mail message. This case con-

cerns a criminal charge predicated on nonconsensual sexual misconduct and indecent exposure which was proved beyond a reasonable doubt.

should not be undertaken by the CID on its own initiative without "a referral from the member's commander," unless the CID Director or Commander or Principal Deputy "determines that there is credible information that an offense has been committed and that the expenditure of investigative resources is appropriate." Para. A.

In the present context, it is unclear whether the "member's commander" to whom this Instruction refers would be only Nadel's unit commander or whether, as the Government argues, it could also be the commander of the unit to which Keeley was assigned. Moreover, there is a dispute between the parties as to whether Major Kazin, the deputy commander at Camp Hansen, where Keeley was stationed, was Keeley's "acting" commander at the time because the regular commander was absent.

Finally, the defense contends that Keeley's allegations did not constitute "credible information that an offense ha[d] been committed." Keeley interpreted appellant's remarks as an overture for him to engage with Nadel in homosexual conduct that would violate Article 125 or Article 134. In light of information obtained later from others, Keeley's interpretation is quite convincing. However, we can hardly say that the conversation described by Keeley could constitute an attempt to commit sodomy, in violation of Article 80 of the Code, 10 USC § 880, or even a solicitation, in violation of Article 134 of the Code, cf. paras. 4, 51, and 105, Part IV, Manual for Courts–Martial, United States (1995 ed.).

The fallacy in appellant's argument is that, even if we conclude that the CID violated DoD Instruction 5505.8—whether intentionally or unwittingly—this circumstance would not authorize suppression of the evidence on which appellant was convicted. According to its own terms, the Instruction was issued "as a matter of investigative priorities and resource limitations"; and it does not purport to create any right on the part of a servicemember to be free from investigation or to prevent the Government from using evidence obtained during an unauthorized investigation.

Although a military judge's exclusion of evidence was upheld in a situation where we concluded that it was obtained contrary to the provisions of a regulation intended to confer a right on servicemembers, *United States v. Manuel*, 43 MJ 282 (1995), we have refused to invoke an exclusionary rule when it was unclear that the military regulation on which the defense relied was intended to create a right personal to the accused, *United States v. Foust*, 17 MJ 85, 87–88 (CMA 1983); *United States v. McGraner*, 13 MJ 408 (CMA 1982). Likewise, we have held that violation of a directive establishing a policy as to when prosecution of an accused should take place does not constitute a bar to trial when the directive was not issued to protect rights of servicemembers. *Cf. United States v. Kohut*, 44 MJ 245 (1996); *United States v. Sloan*, 35 MJ 4 (CMA 1992).

Article 36(a), UCMJ, 10 USC § 836(a), grants the President the power to prescribe "modes of proof" for courts-martial. Traditionally those "modes of proof," including rules for receipt or exclusion of evidence, have been promulgated by the Manual for Courts–Martial and amendments thereto. To predicate exclusion of evidence on directives not issued by the President and not contained in the Manual seems inconsistent with Article 36. For this reason as well, we are unwilling to accept appellant's contention that violation of DoD Instruction 5505.8 would necessitate exclusion of the Government's evidence against appellant.

We observe also that no constitutional right of appellant has been violated. No search has occurred, and Nadel's confession was not coerced. Furthermore, there is no general right of privacy on which appellant can rely. *Cf. Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

Prior to commission of the crimes involved in this case, Congress enacted 10 USC § 654, which is entitled: "Policy concerning homosexuality in the armed forces." Like the DoD Instruction, this statute created no right in any individual to have evidence excluded or any immunity from prosecution for any servicemember with respect to conduct—consensual or otherwise—which violat-

ed the punitive articles of the Code. Moreover, appellant cannot reasonably claim that, in committing the offenses against Timperio, he relied in any way on the provisions of 10 USC § 654, or DoD Instruction 5505.8, or any other statute or directive.

In summary, we find in our precedents no authority for excluding the evidence against appellant—and thereby virtually granting him immunity. The President, of course, can direct his military subordinates to refrain from preferring charges or to not offer at trial evidence obtained in an unauthorized investigation. Moreover, under certain circumstances, he or his subordinates may make binding offers of immunity. *Cooke v. Orser*, 12 MJ 335 (CMA 1982). However, the issuance of directives by the President or his subordinate commanders does not automatically give rise to the exclusion of evidence for which appellant has argued.

### III

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges SULLIVAN and GIERKE concur.

CRAWFORD, Judge (concurring in the result):

I agree with the majority that "the President [has] the power to prescribe 'modes of proof' for courts-martial." 48 MJ at 488. Service directives may grant even more rights to a defendant. *United States v. Lopez*, 35 MJ 35, 39 (CMA 1992). If such a directive has been promulgated, it would not preclude a Service Secretary from providing for the exclusionary sanction plus other sanctions, when there is a violation of that regulation. *See, e.g., United States v. Manuel*, 43 MJ 282, 288–89 (1995)(failure to follow Department of Defense directive as to preservation of urine samples led to exclusion of evidence); *United States v. Dillard*, 8 MJ 213 (CMA 1980)(failure to follow supplement to Army Regulation led to suppression of evidence); *United States v. Holsworth*, 7 MJ 184, 186 (CMA 1979).