**UNITED STATES**

v.

**Staff Sergeant Keith M. TERRY,
United States Air Force.**

**Misc. Dkt. 2007–05.**

U.S. Air Force Court of Criminal Appeals.

8 Feb. 2008.

Appellate Counsel for the United States: Captain Jamie L. Mendelson (argued), Colonel Gerald R. Bruce, and Major Matthew S. Ward.

Appellate Counsel for Appellee: Major Shannon A. Bennett (argued), Lieutenant Colonel Mark R. Strickland, and Captain Tiffany M. Wagner.

Before WISE, HEIMANN, and SOYBEL, Appellate Military Judges.

## OPINION OF THE COURT

WISE, Chief Appellate Judge:

On 13 October 2003, the appellee was convicted at a general court-martial of violating a lawful no-contact order and raping a female airman in violation of Articles 92 and 120, UCMJ, 10 U.S.C. §§ 892 and 920. On 17 October 2003, he was sentenced by a panel of officer members to a dishonorable discharge, confinement for 8 years, forfeiture of all pay and allowances, reduction to E–1, and a reprimand. On 29 January 2007, our superior court, the Court of Appeals for the Armed

Forces, found error on an issue not relevant to this Article 62 appeal,[1] set aside the findings and sentence, and authorized a rehearing.

The rehearing began on 15 August 2007. The military judge, in a pretrial Article 39(a) session, granted a defense motion to dismiss the rape charge and specification because of government misconduct. The government, between the date of the appellee's conviction and sentence and the date our superior court reversed those results, destroyed or otherwise disposed of evidence pertinent to the case. The government appealed that decision to this Court pursuant to Article 62, UCMJ, 10 U.S.C. § 862. On careful consideration of that appeal, the record of trial, the appellate briefs submitted by both sides, and oral arguments before this Court,[2] we conclude the military judge abused his discretion in granting the motion to dismiss the charge and specification.

*Background*

The appellee was a medical technician in the radiology department at the Ehrling Bergquist Hospital located at Offutt Air Force Base (AFB), Nebraska. He first met Airman First Class (A1C) S on 6 December 2002 when A1C S reported to the radiology department for an ultrasound examination pursuant to directions from her treating physician. During the course of the examination, the appellee asked A1C S if she would permit him to take ultrasound examinations of her extremities for a college project in which he was participating. A1C S agreed and returned to the hospital the next day, a Saturday, at approximately 1200 hours where she met with the appellee.

The appellee led A1C S to an examination room in the radiology department, where he conducted an ultrasound examination of her arm, then her leg, and ultimately her groin area after first asking A1C S to remove her pants and panties. A1C S alleges the appel-

lee eventually engaged in sexual intercourse with her by force and without her consent.

A1C S soon thereafter reported the alleged rape to law enforcement officials. She prepared a written statement for an investigator from the Office of Special Investigations (OSI) at Offutt AFB, Nebraska in which she said she ended the alleged rape by pulling away from the appellee and sitting up on the examination table. A1C S also made oral statements to an OSI agent describing the facts and circumstances leading up to, during, and subsequent to the alleged rape. A1C S did not allege that there was a physical struggle at any time between her and the appellee that could have resulted in torn clothing. The medical technician who took possession of the clothing the appellee was wearing on the date of the alleged assault examined the clothing and found no rips, blood, or other signs of struggle.[3]

Another member of the appellee's squadron, Master Sergeant (MSgt) H was directed to pick up the appellee from the OSI office just after midnight on the same evening as the alleged rape. The appellee admitted to MSgt H that he engaged in sexual intercourse with A1C S but stated it was consensual. On Monday, 9 December 2002, the appellee admitted to a co-worker, SSgt W, that he engaged in sexual intercourse with A1C S again stating it was consensual. The appellee made similar admissions to a third person, A1C B, on 9 December 2002.

There was, at the time of the alleged rape, a surveillance system operating in the Ehrling Bergquist Hospital. The system consisted of 16 cameras located throughout the hospital including one in the radiology department and one camera covering the exit from which A1C S most likely left the hospital. There was no camera in the examination room in which the alleged rape occurred. The cameras did not take rolling film of all within their field of view. One camera would snap a still photo of the scene before it and then, one second later, the next camera in

---

1. Article, 62 UCMJ, 10 U.S.C. § 862.

2. Oral argument in this case was hosted by the Michigan State University College of Law in Lansing, Michigan as part of the Court's "Project Outreach."

3. The clothing was taken into evidence at that time by OSI and was later improperly disposed of.

the sequence would snap a still photo and so on until the cycle was completed 16 seconds later. Thus, the camera located in the radiology department would take a still picture and then, 16 seconds later, take another still picture, and so on throughout the day.

An OSI agent took 48 hours of surveillance photos into evidence. The photos were not date stamped so 48 hours of photos were taken to ensure photographs taken before, during, and after the alleged rape were captured. Because there was no date stamp on the photos, the only way to view the still photos of the appellee or A1C S as he or she walked through the hospital was to observe the photos from beginning to end until the relevant scenes appeared. The agent viewed a few hours of the photos and determined they were without evidentiary value. She returned the photos to the surveillance system custodian prior to the appellee's first trial. The existence of the photos and their return to the custodian were noted in the original OSI report. The photos can no longer be located. The military judge specifically found that the government had not acted in "bad faith" in the loss or destruction of the photos.

The military judge found that the OSI took into evidence the following items that were later destroyed or otherwise disposed of: a cardboard box containing a clean sweep of the crime scene room including a cotton swab and glass vial; a sexual assault protocol kit; one 14 × 17 black ultrasound film depicting a screen labeled "Exam directory: Hard Disk;" four 14 × 17 black ultrasound films depicting ultrasound x-rays [4]; clothing of A1C S obtained from a sexual assault protocol kit that included one tan tank top and one navy blue tee shirt; a cardboard box containing suspected bodily fluids taken from the chair at the end of the examination table in

the room in which the alleged assault took place; one sexual assault kit taken from A1C S; clothing taken from the appellee as part of a sexual assault kit; a cardboard box containing suspected bodily fluids taken on a cotton swab and one glass vial; clothing items seized from the appellee,[5] eight pieces of brown paper towel placed in a paper bag; one pair of latex gloves; three pairs of latex gloves; three condoms; nine green rubber bands; a hospital bag full of sheets, towels, and hospital gowns; a three page handwritten document (NFI); a paper envelope from the Nebraska State Patrol; and a second paper envelope from the Nebraska State Patrol.

Included within the items on the above list were panties worn by A1C S on the date of the alleged assault and a vaginal swab taken from her. The Nebraska State Patrol Crime Laboratory tested these items. Semen was identified on the vaginal swab and the panties and DNA testing matched the semen to the appellee. The "suspected bodily fluids" taken from the chair at the end of the examination table in the room in which the alleged rape took place were consumed in the DNA testing. The testing of these "suspected bodily fluids" also revealed the presence of the appellee's DNA.

OSI offices routinely request permission to destroy evidence held in their possession from base legal offices. The OSI Detachment at Offutt AFB, Nebraska requested permission to destroy the evidence identified above from the Offutt AFB Legal Office on 17 February 2005, while the appellee's case was still on appeal and yet to be decided by our superior court. Permission was erroneously granted to destroy this evidence. The evidence, except for the ultrasound film, was destroyed or otherwise disposed of and is

---

4. This ultrasound film was from the examination performed by the appellee on A1C S on 6 December 2002, the day before the alleged rape. Testimony offered by the government pursuant to its Motion for Reconsideration before the trial judge established that the ultrasound film thought to have been destroyed had actually been attached to the OSI report and was offered into evidence. The trial judge failed to address this discovery of the film in his "findings and conclusions" when ruling on the government's Motion for Reconsid-

eration. We find this evidence is in existence and available at retrial.

5. The military judge failed to include these items in his findings of fact. The judge possibly determined that these were the same items referenced in our entry above noted as "clothing taken from the appellee as part of a sexual assault kit." We will assume there were additional clothing items taken from the appellee for our analysis.

unavailable for the appellee's rehearing.[6] The military judge specifically found that the government had not acted in "bad faith" when this evidence was destroyed or otherwise disposed of.

The military judge, in ruling on the defense motion to dismiss the rape charge and specification, concluded: "However, due to what only can be described as a lack of due diligence to preserve and protect evidence and to make it available to the accused has resulted in this case of the accused being denied his discovery rights under military law and thus denied his Constitutional right to a fair trial." The judge dismissed the rape charge and specification.

### Jurisdiction and Standard of Review

The United States may appeal an order or ruling of the military judge that terminates the proceedings with respect to a charge or specification. Article 62(a)(1), UCMJ. The military judge's decision to dismiss the rape charge and specification meets the jurisdictional requirements of Article 62.

In ruling on Article 62 appeals, we "may act only with respect to matters of law." Article 62(b), UCMJ. We are bound by the factual determinations of the military judge, except where they are unsupported by the record or are clearly erroneous. *United States v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985); *United States v. Plants*, 57 M.J. 664, 665 (A.F.Ct.Crim.App.2002). We consider the military judge's conclusions of law de novo. *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F.1995). "On questions of fact, [we ask] whether the decision is *reasonable;* on questions of law, [we ask] whether the decision is *correct.*" *United States v. Baldwin*, 54 M.J. 551, 553 (A.F.Ct.Crim.App.2000) (quoting 2 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 7.05 (3d ed.1999)). If the answer to either question is "no," then the military judge abused his discretion. *Ayala*, 43 M.J. at 298.

### Discussion

The military judge found that it cannot be determined if the surveillance film or the other items of evidence missing or destroyed contained exculpatory matter. We concur with this finding. Therefore, we are not dealing with the loss of clearly exculpatory evidence that is material to guilt or punishment and required to be provided to the appellee pursuant to the Due Process Clause of the Fourteenth Amendment.[7] *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Instead, we are dealing with evidence that is only *potentially useful.*

### Potentially Useful Evidence

■ The leading United States Supreme Court case dealing with the government's obligation to preserve evidence of this nature is *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The Court articulated two criteria that must be met before an accused can prevail in his argument that the government violated his 14th Amendment Due Process rights by improperly disposing of potentially useful evidence. Those criteria are: 1) the evidence must possess an exculpatory value that was apparent before the evidence was destroyed and 2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Id.* at 489, 104 S.Ct. 2528; *United States v. Kern*, 22 M.J. 49, 51 (C.M.A. 1986). The Supreme Court added a third criteria in the case of *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The Court established that an accused must show that law enforcement officials acted in "bad faith" when they lost or destroyed such evidence. *Id.* at 58, 109 S.Ct. 333; *United States v. Mobley*, 31 M.J. 273, 277 (C.M.A.1990).

■ The United States Supreme Court has provided examples of "bad faith" in such cases. Those examples include allegations of

---

6. The appellee had knowledge of and access to this evidence prior to his first trial. The government properly notified the appellee of the destruction of this evidence and loss of the surveillance film prior to the start of his rehearing.

7. U.S. Const. amend. XIV.

**518**

"official animus towards respondents or of a conscious effort to suppress exculpatory evidence," *Trombetta*, 467 U.S. at 488, 104 S.Ct. 2528, and "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333. We concur with the military judge that the government did not act in bad faith in destroying this evidence. Because the government did not act in bad faith in destroying or otherwise disposing of this evidence, the appellee's constitutional right to due process was not violated.[8]

### *Rule for Courts–Martial (R.C.M.) 703*

■ The military has safeguards granted to a military defendant beyond the minimum requirements of the Constitution as established in *Trombetta* and *Youngblood.* Rule for Courts–Martial (R.C.M.) 703 states:

"(a) *In general.* The prosecution and defense and the court-martial shall have equal opportunity to obtain witnesses and evidence, including the benefit of compulsory process.

. . . .

(f) *Right to evidence.*

(1) *In general.* Each party is entitled to the production of evidence which is relevant and necessary.

(2) *Unavailable evidence.* Notwithstanding subsection (f)(1) of this rule, a party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process. However, if such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of or could have been prevented by the requesting party."

The first thing to note about this rule is it eliminates the requirement for an accused to establish bad faith on the part of the government in order to obtain relief. An accused need only establish that such evidence "is of such central importance to an issue that it is essential to a fair trial," and "there is no adequate substitute for such evidence." *See United States v. Madigan*, 63 M.J. 118 (C.A.A.F.2006). We must analyze the legal impact of the missing evidence pursuant to the provisions of R.C.M. 703.

There was no camera in the examination room in which the alleged rape occurred. At best, the photos would have captured still images of A1C S and the appellee as they respectively moved through and exited the hospital. The appellee argues that the photos might have captured images of A1C S or the appellee that could have been helpful at trial to rebut the rape allegation. It is just as likely that images captured could have been inculpatory. It is also possible that any images of A1C S or the appellee were of neither inculpatory nor exculpatory value and, finally, it is possible that the photos were of no evidentiary value as was determined by the OSI agent who viewed only a few hours of the 48 hours of photos. The possibility that potentially exculpatory images could have been found on the surveillance photos is simply too speculative to conclude that the missing photos were "of central importance to an issue that is essential to a fair trial."

The appellee argues he was harmed by the loss of the clothing worn by the appellee and A1C S. He claims the lack of rips, blood, or other evidence of struggle on the clothing would indicate that A1C S did not physically resist the appellee's advances and is evidence of consent. However, the appellee can obtain comparable evidence by other reasonably available means. A1C S swore there was no physical altercation between her and the appellee before, during, or after the alleged rape. The medical technician who took the appellee's clothing into evidence has al-

---

**8.** We dispose of this issue based on lack of bad faith on the part of the government in losing or destroying the evidence. However, for reasons discussed later in this decision, we find that the individual items of lost or destroyed evidence either did not possess an exculpatory value that was apparent before the evidence was destroyed or was of a nature that the defendant will be able to obtain comparable evidence by other reasonably available means.

ready testified that he examined the clothing and found no evidence of struggle thereon. The appellee has comparable evidence readily available to establish this point and thus an "adequate substitute for such evidence."

The appellee argues that had the panties and vaginal swab been retested exculpatory evidence might have been obtained. The most likely result of retesting the panties and vaginal swab is that the appellee's semen and DNA would again have been found on the items. However, regardless of what result would have been produced, it is doubtful that such evidence, even if favorable in some way to the appellee, would have been of "central importance to an issue that is essential to a fair trial."

Specifically, A1C S claims that the appellee had sexual intercourse with her. The appellee admitted to three different witnesses that he had sexual intercourse with A1C S. The appellee's semen and DNA were found on the panties and vaginal swab confirming, to some degree, the claims of A1C S and admissions of the appellee. The contest in this case will surely focus on the second element of a rape specification, whether the sexual intercourse was "by force and without the consent" of A1C S, and not a determination of whether sexual intercourse occurred. We are not suggesting that the appellee cannot contest at trial that he engaged in sexual intercourse with A1C S or even that he should not contest that fact. However, for our analysis we conclude the defense will more likely focus on the consent element of the offense rather than whether the act occurred. The loss of the panties and vaginal swab and the potential results of retests on these items go to whether or not sexual intercourse between the appellee and A1C S occurred. Based on the allegation made by A1C S, the admissions made by the appellee, and the scientific tests obtained from the tests conducted on the panties and vaginal swab, potential results of a retest of this evidence are not "of central importance to an issue that is essential to a fair trial."

Finally, as to these items, the appellee has an "adequate substitute for such evidence."

He has requested the assistance of a DNA expert and that request will most certainly be granted prior to reconvening this court-martial. That expert can examine the test results and will have the ability to attack any errors or flaws in the findings of the government's experts. We conclude that the rights provided to the appellee by R.C.M. 703 were not violated by the destruction of the panties and vaginal swab.

The appellee argues that had the condoms been available for testing, possible evidence showing that the appellee wore a condom during the sexual act could have been obtained and used to impeach the credibility of A1C S who said a condom was not used by the appellee during intercourse.[9] The statement provided by A1C S to the OSI will provide opportunity on other grounds for the appellee to impeach her claim that the intercourse was by force and without her consent. The addition of this piece of impeachment evidence would add little to what is already available to the appellee. We conclude that even if the testing of the condoms had yielded such a result, such evidence is not "of central importance to an issue essential to a fair trial."

The bodily fluids taken from the chair and found to contain the appellee's DNA were consumed during testing and are not available for retesting. However, the appellee can "challenge the test results by attacking the reliability of the testing procedures and the competence and credibility of the testing official through cross-examination and through testimony of [his] own expert." *United States v. Garries*, 22 M.J. 288, 292 (C.M.A.1986). Hence, there is an "adequate substitute" for the loss of this evidence.

As to the remaining items of evidence, no reasonable theory has been offered to show how these individual items of evidence by themselves or through findings obtained by testing could have benefited the appellee's case. The loss of each of these items is not "of central importance to an issue that is essential to a fair trial."

---

9. The appellant's position is that these "condoms" were used to protect the ultrasound

equipment and not intended for use during sexual intercourse as a prophylactic.

**520**

*Cumulative Impact of the Loss of Evidence Pursuant to R.C.M. 703*

The appellee argues that the prejudicial impact of the loss of all of these items of evidence was so detrimental to his ability to obtain a fair trial that the cumulative impact on his rights should be considered as a R.C.M. 703 violation warranting affirmation of the military judge's decision to dismiss the rape charge and specification. The appellee relies on *United States v. Manuel*, 43 M.J. 282 (C.A.A.F.1995) for our authority to find a R.C.M. 703 violation in unique circumstances. This argument is compelling as the government's loss of evidence is shocking. We will not hesitate to approve or make such a ruling in the appropriate case. However, having had the opportunity to receive written briefs, to hear argument, and time to research and reflect on the issue, luxuries not afforded to the military judge, we are convinced that the individual items of lost evidence are so far removed from being "of central importance to an issue that is essential to a fair trial" or there exists an "adequate substitute for such evidence" that even the impact of their collective loss cannot meet this standard.

*Conclusion*

We find the military judge abused his discretion in dismissing the rape charge and specification. Accordingly, the appeal of the United States is granted. The ruling of the military judge is vacated and the record is remanded for further proceedings.