**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

| | | |
|---|---|---|
| **UNITED STATES,** ) | | **Misc. Dkt. No. 2013-27** |
| **Appellant** ) | | |
| ) | | |
| **v.** ) | | |
| ) | | **ORDER** |
| **Airman First Class (E-3)** ) | | |
| **STEVEN E. SETON,** ) | | |
| **USAF,** ) | | |
| **Appellee** ) | | **Panel No. 2** |

WEBER, Judge:

The Government filed an interlocutory appeal under Article 62, UCMJ, 10 U.S.C. § 862, in this matter. The Government alleges the military judge abused his discretion in dismissing with prejudice the sole Charge and Specification based on his finding that the Government violated Rule for Courts-Martial (R.C.M.) 703(f) by failing to preserve video taken in dormitory hallways. Specifically, the Government contends: 1) The evidence was not of such central importance to an issue as to be essential to a fair trial; 2) There was an adequate substitute for the lost evidence; and 3) The military judge abused his discretion in his choice of remedy (dismissing the Charge and Specification with prejudice) without finding the Government acted in bad faith. We disagree. We find the military judge acted within his discretion in finding an R.C.M. 703 violation and in dismissing the Charge and Specification with prejudice.

*Background*

The Government referred one charge and specification of sexual assault under Article 120, UCMJ, 10 U.S.C. § 920, alleging the appellee caused bodily harm to Airman First Class (A1C) BB through nonconsensual vaginal intercourse. A1C BB celebrated her birthday with her boyfriend, A1C DB, on 9 September 2012. They consumed alcohol and engaged in casual activities in her dormitory room during the afternoon and evening. A1C BB sent the appellee electronic messages throughout the evening, and at 2349 hours, she messaged the appellee that A1C DB had left and she was depressed. She asked the appellee to come to her room. When he did not immediately respond, A1C BB went to see the appellee in his dormitory room in the same building.

In the weeks leading up to her birthday, A1C BB and the appellee engaged in some amorous activity short of intercourse on more than one occasion. The night of her birthday, A1C BB entered the appellee's room and they talked for a short period. They

progressed to kissing and then sexual intercourse, which A1C BB agreed was initially consensual. A few minutes after the intercourse began, however, she told the appellee "we shouldn't be doing this," because she had a boyfriend, and she wanted to stop, or words to that effect. She later reported that, in her mind, the intercourse (which she said lasted a total of five to ten minutes) was nonconsensual starting when she made these statements. According to A1C BB, the appellee continued for another 30 to 90 seconds past that point before intercourse concluded. Shortly after this incident, A1C BB reported it to her friend and then her boyfriend before making a formal report alleging the intercourse (or some portion thereof) constituted a sexual assault.

Agents from the Air Force Office of Special Investigations (AFOSI) investigated this matter. The appellee waived his rights under Article 31, UCMJ, 10 U.S.C. § 831, and provided detailed verbal and written statements about the incident. He told agents he believed the intercourse was fully consensual. He agreed that at one point, A1C BB told him she wanted to stop because this was not fair to her boyfriend, or words to that effect. The appellee stated he promptly ceased intercourse, but then twice resumed when A1C BB expressed a desire to re-engage in intercourse. Eventually, according to the appellee, intercourse ceased for good when A1C BB again expressed a desire to stop because she needed to retrieve her cell phone. The appellee also told AFOSI agents a video surveillance system in the dormitories would confirm certain aspects of his account about their interaction before and after the alleged sexual assault, and he voiced support for agents to retrieve the video.

On 10 September 2012, AFOSI agents contacted Technical Sergeant (TSgt) MS, a dormitory leader for the building where the appellee and A1C BB resided. TSgt MS showed AFOSI agents video taken from cameras in dormitory hallways the previous night starting at about 1700 hours. At the agents' request, TSgt MS focused on portions of the video demonstrating interaction between the appellee and A1C BB both before and after the alleged sexual assault. The agents were unable to make a copy of the video, but told TSgt MS another agent would return to make the copy. The AFOSI agents knew the video would normally be overwritten after about 14 days, but they mistakenly believed TSgt MS would secure the video.

Another AFOSI agent, Special Agent (SA) JT, took over as the investigation's lead agent four days later. SA JT intended to go to the dormitory to retrieve the video, but was delayed for a number of reasons, including in-processing to the base, workload, and typhoons that struck the installation. SA JT knew of the video's existence, but not its substance or importance to the investigation, and he erroneously believed TSgt MS had secured the video. He finally arrived at the dormitory to retrieve the video on 25 September 2012, 15 to 16 days after the video was recorded. By that time, the video was unrecoverable, both because it would have been overwritten by this time and because a typhoon had caused the video surveillance system to be reset.

As the investigation under Article 32, UCMJ, 10 U.S.C. § 832, was pending, defense counsel submitted a discovery request for "[a]ll video recorded or recovered from the dorm building where the alleged sexual assault occurred." Trial counsel erroneously responded "the video cameras at the dorm were not working that night due to typhoon damage." However, several months later, defense counsel procured an affidavit from TSgt MS attesting that video had once existed. Defense counsel then moved the military judge to dismiss the Charge and Specification with prejudice, alleging a violation of either Article 46, UCMJ, 10 U.S.C. § 846, or R.C.M. 703.

TSgt MS testified during a motions hearing as to his memory of the video. He stated in the evening leading up to the alleged sexual assault, A1C BB and the appellee were recorded two to four times interacting in a "semi-flirtatious" manner, chasing each other down the hallways, hitting one another with an inflatable hammer, and at one point hugging each other for 5 to 10 seconds. He also testified that around midnight, the video showed A1C BB entering the appellee's room and departing about 60 to 90 minutes later. Finally, he testified the video showed A1C BB departing the appellee's room walking crooked and bumping into a door, followed thereafter by the appellee looking "distraught." The appellee and A1C BB then talked outside A1C BB's dormitory room for a few minutes, according to TSgt MS. TSgt MS testified that because more than a year had passed since he watched the video with AFOSI agents, he could only remember "big details" about the video, not "little intricate details." Two AFOSI agents who watched the video with TSgt MS both testified they remembered very little about the substance of the video.

The portions of the video TSgt MS remembered contradicted A1C BB's previous statements in at least three respects. First, TSgt MS recalled A1C BB and the appellee having extensive interaction in the hours leading up to the alleged sexual assault, while A1C BB stated at the Article 32, UCMJ, hearing she did not believe she had any contact with the appellee on the day of the alleged sexual assault, apart from possibly some brief interaction at the smoke pit. Second, TSgt MS recalled A1C BB and the appellee remained in the appellee's dormitory room for roughly 60 to 90 minutes, contradicting A1C BB's statements that she was in the appellee's room no more than 30 to 45 minutes. Finally, TSgt MS remembered A1C BB and the appellee spoke outside A1C BB's room shortly after the alleged sexual assault, contradicting A1C BB's previous statements that she rushed out of the appellee's room and had nothing more to do with him that night.

The military judge found the Government did not violate Article 46, UCMJ, or the Due Process Clause of the Fifth Amendment[1] in failing to preserve the video, because the appellee did not demonstrate the Government acted in bad faith.[2] However, the military

---

[1] U.S. CONST. amend. V.

[2] The military judge did note some concerns with investigators' actions, even though he found these actions did not rise to the level of bad faith. Special Agent JT testified he did not document the loss of the video in the report of investigation; he did not take steps after learning the video was lost to obtain statements from those who viewed the

judge found the Government violated R.C.M. 703(f)(2). He noted the lost evidence could have been used to impeach A1C BB's earlier statements on these matters, and held A1C BB's credibility was an issue of central importance in the court-martial. The military judge then found dismissal with prejudice was appropriate because "consent, as well as mistake of fact as to consent, are of such central importance to a charge of sexual assault by nonconsensual acts that the videos from [the dormitory] are essential to a fair trial for both the Government and the accused," and reasoned no other remedy would appropriately cure the harm caused by the Government's R.C.M. 703 violation.

*Jurisdiction and Standard of Review*

This Court has jurisdiction to hear this appeal under Article 62(a)(1)(A), UCMJ, which authorizes the Government to appeal "[a]n order or ruling of the military judge which terminates the proceedings with respect to a charge or specification."

On an interlocutory appeal, we "may act only with respect to matters of law." Article 62, UCMJ. Thus, we are bound by the military judge's findings of fact unless they are clearly erroneous, and we have no authority to find additional facts. *United States v. Baker*, 70 M.J. 283, 287-88 (C.A.A.F. 2011). We "'give due deference' to the judge's findings of fact and accept them 'unless . . . unsupported by the evidence of record or . . . clearly erroneous.'" *United States v. Salazar*, 44 M.J. 464, 471 (C.A.A.F. 1996) (quoting *United States v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985)).

This Court reviews a military judge's ruling on a motion to dismiss for an abuse of discretion. *United States v. Gore*, 60 M.J. 178, 186-87 (C.A.A.F. 2004). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citations omitted) (internal quotation marks omitted). "When a court is limited to reviewing matters of law, the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." *Gore*, 60 M.J. at 185 (quoting *Burris*, 21 M.J. at 144 ) (internal quotation marks omitted).

*Discussion*

R.C.M. 703(f)(1) states: "Each party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(f)(2) states that despite the broad rule in

video; and he did not tell trial counsel about the prior existence of video when trial counsel asked for any video from the dormitory.

R.C.M. 703(f)(1), "a party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process." However, it continues,

> If such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of or could have been prevented by the requesting party.

R.C.M. 703(f)(2) does not require the accused to demonstrate bad faith on the part of the Government, something an accused may have to demonstrate to obtain relief under Article 46, UCMJ, or the Due Process Clause. *United States v. Terry*, 66 M.J. 514, 518 (A.F. Ct. Crim. App. 2008). R.C.M. 703 therefore represents "the President[] going even further than the Constitution and the Uniform Code in providing a safeguard for military personnel." *United States v. Manuel*, 43 M.J. 282, 288 (C.A.A.F. 1995).

To be entitled to relief under R.C.M. 703(f)(2), an accused must show: (1) The evidence is relevant and necessary; (2) The evidence has been destroyed, lost, or otherwise not subject to compulsory process; (3) The evidence is of such central importance to an issue that it is essential to a fair trial; (4) There is no adequate substitute for such evidence; and (5) The accused is not at fault or could not have prevented the unavailability of the evidence. R.C.M. 703(f)(1)-(2). The Government does not challenge the military judge's findings that the evidence has been lost and the appellee was not at fault and could not have prevented the unavailability of the evidence. Therefore, we will only discuss the first, third, and fourth prongs of this analysis, along with the military judge's choice of remedy.

<u>The evidence was relevant and necessary</u>

A1C BB and the appellee were the only two witnesses to the alleged sexual assault. If A1C BB's account of the events in the appellee's dormitory room is accurate, the appellee may be guilty of a crime. If the appellee's account is accurate, the appellee is not guilty. Therefore, A1C BB's credibility is, as the military judge found, an extremely relevant issue in the case.

The Government asserts that portions of the video (as recounted by TSgt MS) may have also contradicted the appellee's account in some ways. The implication of this argument is the video was therefore not relevant, or at least not necessary, because it did not definitively demonstrate who is more credible. The Government's argument fails in two respects. First, a fair reading of all the statements provided by the appellee and A1C BB indicates the video would more closely align with the appellee's account, based on TSgt MS's recollection. Second, the video need not have definitively established

which person was more credible in order to be relevant and necessary. What is known about the lost video indicates it would have supplied grounds to impeach A1C BB's anticipated testimony on at least three points. Therefore, even if the video also contradicted some aspects of the appellee's account, the lost video still was relevant because it had a "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Mil. R. Evid. 401. The video – from what is known of it – was not cumulative and would have contributed in some positive way to the defense's presentation of its case on a matter of issue (namely, the credibility of A1C BB's testimony). The video was therefore "necessary." *See* R.C.M. 703(f)(1), Discussion.

The military judge's conclusion that the evidence was relevant and necessary is supported by the testimony of the AFOSI agents who interviewed the appellee. Agents testified in motions practice that the appellee supported the idea of retrieving the video, as it would corroborate his account that he and A1C BB were playing in the hallways that evening. The AFOSI agent testified that the appellee's willingness to have AFOSI view the video "bodes well in his favor" and "[d]efinitely made him sound a lot more credible to me." The agent also testified that if he were in the appellee's position, he would want the video.

<u>The evidence was of such central importance to an issue that it is essential to a fair trial</u>

The military judge reasonably determined A1C BB's credibility was a central issue in the case and the video may have supplied a basis to impeach A1C BB's earlier statements about the incident. In short, only two people know for certain what happened in the appellee's dormitory room; no other direct evidence is available concerning what transpired in that room. Video that apparently would have directly impeached the credibility of one of those two people is reasonably categorized as "of such central importance to an issue that is essential to a fair trial." R.C.M. 703(f)(2).

The Government compares this case to *Terry*, a published decision of this Court in which we found no R.C.M. 703 or Article 46, UCMJ, violation for the Government's loss of surveillance system photos outside the scene of an alleged rape, among other evidence. The *Terry* Court found such photos were not of such central importance to an issue that they were essential to a fair trial. Our Court reasoned there was no camera in the room of the alleged rape, and the photos would have at best captured still images of the participants as they moved through the building. *Terry*, 66 M.J. at 518. We concluded nothing was known about what the images could have represented, and therefore "[t]he possibility that potentially exculpatory images could have been found on the surveillance photos is simply too speculative to conclude that the missing photos were 'of central importance to an issue that is essential to a fair trial.'" *Id.*

*Terry* is easily distinguishable from the instant case. This matter does not merely involve still images but video, which would have offered the factfinder a much greater opportunity to view the interactions between A1C BB and the appellee. In *Terry*, AFOSI agents immediately dismissed the photos as of no evidentiary value while the opposite is true here. AFOSI agents in the instant case recognized the potentially exculpatory value in the video even though they failed to preserve the video. Most importantly, in *Terry* there was no reason to believe the still images would provide any basis to impeach the credibility of the alleged victim. Here, TSgt MS's testimony provides a solid indication the video could be used for impeachment. *Terry* is different from the instant case, and provides no basis to disturb the military judge's ruling.

<u>There was no adequate substitute for the evidence</u>

TSgt MS recalled several aspects of the video. The Government argues – as it did at trial – that TSgt MS's testimony serves as an adequate substitute for the evidence because it could have provided the defense with a basis to impeach A1C BB or argue A1C BB consented. In ruling to the contrary, the military judge noted:

> [T]he dynamics of a mutual interaction occurring almost immediately before and after a reported sexual assault cannot be adequately conveyed by a witness' summary description. The old adage, "A picture is worth a thousand words," comes to mind at this point. Simply put, TSgt MS's testimony is not an adequate substitute for the video.

We find this position reasonable, particularly where more than a year had passed since TSgt MS saw the video; he only viewed the video once (and had fast-forwarded through large portions of the video); he admitted he did not remember all the details; and the two AFOSI agents who watched with him remembered almost nothing about the video's contents. The testimony of one person who is not a trained investigator, who was not necessarily looking for exculpatory evidence, and who did not remember many details of the video is simply not an adequate substitute for the video itself. There is a reasonable basis to conclude the video may have included additional evidence of benefit to the defense beyond what TSgt MS remembered, as he admitted he did not know exactly what he was looking for. TSgt MS's testimony might have provided the defense with some basis to impeach A1C BB's credibility, but it is reasonable to conclude his testimony did not capture nearly everything the video would have.

Apart from the video's impeachment value, the probative value of video showing A1C BB and the appellee interacting before and after the charged event may be somewhat limited, as their behavior in the room itself is at issue. However, the evidence's value is not null. The video likely would have shed light on issues raised in statements by A1C BB and the appellee, such as A1C BB's level of intoxication and their demeanors immediately following the charged event. There is simply no way TSgt MS's

testimony could adequately replicate for the factfinder the subtle nuances of the participants' behavior and reactions. The military judge reasonably concluded TSgt MS's testimony is not an adequate substitute for the lost video.

Remedy

When a military judge finds a violation of R.C.M. 703(f)(2), the military judge has "discretion to fashion an appropriate remedy." *Manuel*, 43 M.J. at 288 (emphasis omitted). In *Manuel*, our superior court noted that in a case involving:

> [G]ross negligence in the handling of a urine sample and a significant violation of regulations intended to insure reliability of testing procedures, we will not require an accused to make a further demonstration of specific prejudice before we sustain the remedial relief fashioned by a lower court in the exercise of its discretion.

*Id.* at 287.

We find no abuse of discretion in the military judge's choice of remedy. We recognize the military judge found no bad faith in the Government's actions, and our superior court has stated dismissal of charges may be an appropriate remedy when "bad faith is clearly demonstrated." *United States v. Kern*, 22 M.J. 49, 52 (C.M.A. 1986). However, *Kern* discussed possible remedies for an Article 46, UCMJ, violation. There is no comparable requirement to find bad faith to dismiss charges for an R.C.M. 703 violation.

Again, *Terry* presents some similarities to and some differences from this case. In *Terry*, the military judge dismissed the rape charge and specification, finding the Government did not act in bad faith but that the Government violated R.C.M. 703. On interlocutory appeal, we found under the circumstances of that case, the military judge abused his discretion in finding an R.C.M. 703 violation and in dismissing the charge and specification. However, we also stated, "[w]e will not hesitate to approve or make such a ruling in the appropriate case." *Terry*, 66 M.J. at 520. *Terry* thus supports the position that dismissal of a charge or specification is an allowable remedy for an R.C.M. 703 violation.

R.C.M. 703(f)(2) lists possible remedies such as a continuance or other relief in order to attempt to produce the evidence, or abatement. The military judge's remedy was not one of those listed in the rule, but there is no indication in the rule's text that the list of possible remedies is intended to be exhaustive. The military judge discussed possible remedies, and selected a reasonable remedy to cure the Government's R.C.M. 703(f)(2) violation, balancing the Government's conduct against the harm to the appellee. Neither a continuance nor abatement would have been appropriate, as the video was overwritten

or reset and could not be recovered. The military judge could have simply excluded A1C BB's testimony, but in a case such as this, that remedy would be the functional equivalent of dismissing the charge and specification. Our superior court has approved of dismissing a specification for an R.C.M. 703 violation where the sole evidence supporting that specification is the evidence to be excluded as a result of the Government's failure to preserve evidence, even absent a showing of bad faith. *Manuel*, 43 M.J. at 289. The Government's proposed remedy – requiring the Government to stipulate to the contents of the video – would not have remedied the harm, because TSgt MS's recollection would have been the source of that stipulation, a situation no different than having TSgt MS testify about the video's content. In short, the military judge considered a range of possible remedies and selected a remedy reasonably aimed at curing the harm caused by the Government's violation. The military judge's conclusion was not "outside the range of choices reasonably arising from the applicable facts and the law." *Miller*, 66 M.J. at 307.

*Conclusion*

On consideration of the appeal by the United States under Article 62, UCMJ, it is by the Court on this 24th day of February, 2014,

**ORDERED:**

The appeal of the United States under Article 62, UCMJ, is hereby **DENIED**.[3]

Senior Judge Helget and Judge Peloquin concur.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court

---

[3] Counsel for the appellee, in his brief before this Court, alleged that the Government's appeal of the military judge's ruling amounts to an abuse of prosecutorial discretion, and speculated the Government's appeal was motivated by Congressional criticism regarding the military's handling and prosecution of sexual assault cases. We decline the invitation to speculate into the motives behind the Government's decision to appeal the military judge's ruling. The Government's appeal complies with the substantive and procedural requirements laid out in Article 62, UCMJ, 10 U.S.C. § 862, and Rule for Courts-Martial 908. The Appellate Defense Division is bound to respond to the appeal, and this Court is bound to consider the appeal. Speculation about the Government's motivations is neither necessary nor helpful.