**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**First Lieutenant CALYX E. HARRELL**
**United States Air Force**

**ACM 38538**

**1 July 2015**

Sentence adjudged 6 November 2013 by GCM convened at Scott
Air Force Base, Illinois. Military Judge: Christopher A. Santoro.

Approved Sentence: Dismissal, confinement for 198 days, and forfeiture of
all pay and allowances.

Appellate Counsel for the Appellant: Major Christopher D. James and
Douglas L. Cody, Esquire.

Appellate Counsel for the United States: Major Meredith L. Steer;
Major Daniel J. Breen; and Gerald R. Bruce, Esquire.

Before

ALLRED, HECKER, and TELLER
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent
under AFCCA Rule of Practice and Procedure 18.4.

ALLRED, Chief Judge:

Pursuant to a pretrial agreement at a general court-martial, the appellant pleaded
guilty to wrongful use of marijuana in violation of Article 112a, UCMJ, 10 U.S.C.
§ 912a, and she conditionally pleaded guilty to wrongful possession of marijuana and
drug paraphernalia in violation of Articles 112a and 133, UCMJ, 10 U.S.C. §§ 912a,
933.[1] A panel of officers sentenced the appellant to a dismissal, 198 days confinement,

---

[1] In accordance with the pretrial agreement, the appellant pleaded not guilty to: using and possessing "spice,"
possessing lysergic acid diethylamide (LSD), making a false statement, distributing "spice," and fraternization, in

and forfeiture of all pay and allowances. This sentence was approved by the convening authority.

Before us, the appellant argues (1) a civilian police officer violated her constitutional rights when he extended a traffic stop to accomplish a canine-sniff of her vehicle; (2) the canine-sniff of her vehicle violated the Fourth Amendment[2]; (3) certain charges and specifications against her were withdrawn and then improperly re-referred to trial; (4) her sentence was inappropriately severe; (5) her adjudged and approved dismissal cannot be executed because she has already received an honorable discharge; (6) the military judge abused his discretion by refusing to recuse himself; and (7) she is entitled to new post-trial processing because the staff judge advocate (SJA) who advised the convening authority testified at trial. Finding no error prejudicial to the substantial rights of the appellant, we affirm.[3]

*Background*

The charges against the appellant arose in essentially three stages. The first involved a random drug urinalysis (hereafter "the UA charge"). On 24 April 2012, the appellant's commander ordered urinalysis testing of all members in the squadron. The appellant's urine tested positive for Tetrahydrocannabinol (THC), and a charge of wrongful use of marijuana was preferred on 12 July 2012. In accordance with the recommendation of the Article 32, UCMJ, investigating officer (IO), the convening authority referred the charge and specification to a general court-martial (GCM) on 3 August 2012.

The second set of charges flowed from a traffic stop in Ohio (hereafter "the Ohio charges"). Shortly after midnight on 4 August 2012, the appellant was stopped for speeding by a civilian police officer near Solon, Ohio. In searching her vehicle, the police found marijuana and glass pipes bearing marijuana residue. The appellant was taken to a local jail where she removed a glass jar and a baggie from her pants which contained more marijuana. At the jail, the appellant allegedly denied to the police that she was a member of the Air Force and falsely stated that she was unemployed. On 17 September 2012, the appellant's commander preferred additional charges against the appellant for making a false statement and for possessing marijuana and drug paraphernalia. A new IO was appointed to conduct a second Article 32 Investigation. On 11 October 2012, the IO recommended the additional charges be referred to a GCM

---

violation of Articles 92, 112a, 133 and 134, UCMJ, 10 U.S.C. §§ 892, 912a, 933 and 934. These specifications and their affected charges were withdrawn and dismissed by the convening authority after arraignment.

[2] U.S. CONST. amend IV.

[3] The court-martial order (CMO) contains a minor error. The CMO describes the single allegation under Charge IV as "Specification 1", when it was in fact correctly listed on the Charge Sheet as merely "Specification." We order promulgation of a corrected CMO.

and, soon thereafter, the convening authority referred the Ohio charges to the GCM before which the UA charge remained pending.

The third set of charges arose from disclosures made by an Air Force member, then-Senior Airman B (hereafter the "SrA B charges"). On 12 October 2012, as a result of her own positive test for THC, SrA B was interviewed by members of the Air Force Security Forces and made statements implicating the appellant in further wrongdoing. On 19 October 2012, the convening authority directed that the UA charge and the Ohio charges (referred to trial on 3 August 2012 and 17 October 2012, respectively) be withdrawn and dismissed without prejudice.

After additional investigation, new charges were preferred on 19 November 2012. These included the original UA and Ohio charges, along with the SrA B charges of possessing and using spice, possessing LSD, distributing spice, communicating a threat, and fraternization. The SrA B charges were investigated by the same IO who had conducted the appellant's second Article 32 Investigation involving the Ohio charges. In an Addendum (dated 21 November 2012) to his report from the second Article 32 hearing, the IO recommended that the UA charge, the Ohio charges, and the SrA B charges all be referred to trial by GCM. On 21 December 2012, the convening authority acted in accordance with that recommendation.

The appellant was arraigned on 22 March 2013. On 17-19 June 2013, the military judge convened trial at Scott AFB and ruled on several motions. The judge's rulings did not impact the UA charge or the Ohio charges. Two rulings, however, significantly affected the SrA B charges. First, in response to a defense claim that the government had failed to meet requirements of Rule for Courts-Martial (R.C.M.) 405 and 406, and pursuant to R.C.M. 906(b)(10), the military judge ordered that Specification 3 of Charge II (possession of LSD) be severed from the remaining charges and specifications.[4] Second, in a related ruling finding that the government had failed to meet its discovery obligations, the military judge ordered the convening authority "to re-open or conduct anew the pretrial investigation" of all the SrA B charges, including the now-severed specification alleging possession of LSD. The military judge further ordered the SJA to provide a new advice to the convening authority pursuant to Article 34, UCMJ.

There followed a hiatus in the trial, during which the SrA B charges were investigated at an additional Article 32, UCMJ, hearing. Trial proceedings resumed from 4-6 November 2013, at which time the appellant raised further motions. Pursuant to a pretrial agreement with the convening authority, the appellant then pleaded guilty to the UA Charge and conditionally pleaded guilty to the Ohio charges, with the exception of

---

[4] The military judge found the government's evidence for the specification alleging LSD possession was so weak that it was unlikely to survive a motion for a finding of not guilty, and therefore its litigation with the other pending charges at trial would unfairly prejudice the appellant.

the allegation of making a false statement, which had by then been dismissed by the convening authority. Upon the military judge's finding the appellant's guilty pleas provident, the convening authority withdrew and dismissed the remaining SrA B charges. Additional facts pertinent to the appellant's assignments of error are discussed below.

## I. Lawfulness of the Traffic Stop

During the early morning hours of 4 August 2012, Officer RS of the Solon, Ohio, Police Department was parked along a local highway, operating his radar unit and specifically looking out for potentially impaired drivers. He observed a silver Kia traveling approximately 80 miles per hour (MPH) in the 60 MPH zone. When he pulled the vehicle over, the officer approached the passenger door and found the appellant alone inside. The entire traffic stop was recorded by the patrol car's dashboard camera.

As the appellant handed him her out-of-state driver's license, Officer RS observed that her hair was messy and she looked to be unclean. Her eyes were not fully open and, in his opinion, she "appeared to be high or under the influence of something," although he did not smell alcohol. When responding to routine questions about her destination and speed, the appellant seemed increasingly nervous. Her hands were shaking, there were long pauses before she gave answers, and she sometimes mumbled.

The appellant told the officer that she was traveling from Saint Louis, Missouri, on her way to a local campground the officer knew to be a location for illegal drug activity. The officer became concerned about drug trafficking when he considered the appellant was from out-of-state, was driving a rental car, and was going to an area known for drug use. In the officer's fifteen years of law enforcement, he had never known anyone stopped on their way to that campground who was not in possession of drugs.

Officer RS returned to his car and asked that a canine unit respond to his location. Because the appellant had an out-of-state driver's license, he radioed her license information to his dispatcher to check on its status.

Before Officer RS received a response about her license, the appellant got out of the car and lit a cigarette, despite his prior instruction that she remain in her vehicle. Suspecting she may be trying to distance herself from contraband in her vehicle, Officer RS left his car and approached her. Observing further signs of nervousness, he asked the appellant where the drugs were. She did not answer him but instead asked him questions in response. He also observed her making "target glances" into the vehicle as he asked about drugs. Based on his training, Officer RS took this as an indication she knew there were drugs in the car. He told her that a canine unit was on the way and, when she asked why, he responded that she "fit the profile" or words to that effect.

While Officer RS was talking to the appellant next to her car and waiting for a response to the license inquiry, two more police officers arrived at the scene—six minutes after the traffic stop began. One of them, Officer MT, was accompanied by a working dog named Stryker.[5]  The two walked around the appellant's vehicle, and Stryker alerted near the driver's side door, indicating that he had detected the odor of contraband.  This occurred within four minutes of Officer MT's arriving on the scene. Marijuana and drug paraphernalia were found during a subsequent search of the appellant's car.

Prior to entering pleas in this case, the appellant filed a motion to suppress the evidence obtained after the traffic stop.   At trial, the appellant contended that Officer RS unreasonably prolonged the duration of this traffic stop and impermissibly broadened its scope in order to conduct the dog-sniff that ultimately led to the discovery of drugs in her car. The military judge denied the defense motion.[6]

We review a military judge's ruling on a motion to suppress for abuse of discretion. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004).  We review his factfinding under the clearly-erroneous standard and conclusions of law under the de novo standard.  *Id.*  "On mixed questions of law and fact . . . a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect."  *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995).  "In reviewing a ruling on a motion to suppress, we consider the evidence 'in the light most favorable to the' prevailing party."  *United States v. Reister*, 44 M.J. 409, 413.  In issuing his ruling, the military judge made findings of fact which are supported by the record and which the appellant does not contest on appeal.  He also made conclusions of law which we review de novo.

The Fourth Amendment[7] protects individuals from unreasonable searches and seizures.   Because the temporary detention of individuals during a traffic stop is considered a "seizure" within the meaning of the Fourth Amendment, it is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."  *Whren v. United States*, 517 U.S. 806, 810 (1996).  "The touchstone of the Fourth Amendment is reasonableness."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).

There is no bright-line rule concerning the length of a "reasonable" stop—all the circumstances must be considered.  *United States v. Sharpe*, 470 U.S. 675, 685–86

---

[5] Both Officer MT and Stryker had completed canine training programs and were certified in accordance with the requirements of the State of Ohio and a national certifying agency.  Stryker was trained to detect and alert on heroin, cocaine, methamphetamine, ecstasy, and marijuana.

[6] Pursuant to a pretrial agreement with the convening authority and Rule for Courts-Martial (R.C.M.) 910 (a)(2), the appellant then entered conditional pleas of guilty to Specification 2 of Charge II (possessing marijuana) and Specification 1 of Charge III (possessing drug paraphernalia), reserving the right to review the military judge's ruling notwithstanding her guilty plea.

[7] U.S. Const. amend. IV.

(1985).  A lawful traffic stop may not be prolonged, however, beyond the time reasonably required to effectuate its purpose.  *Rodriguez v. United States*, 135 S.Ct. 1609, 1612 (2015); *llinois v. Caballes*, 543 U.S. 406, 407 (2005).  "A police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."  *Rodriguez*, 135 S.Ct. at 1612.  The authority for the seizure ends "when the tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.* at 1614; *see also United States v. Sharpe*, 470 U.S. 675, 676 (1985) (stating that when determining the reasonable duration of the stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").  This includes verifying the driver's license, checking for outstanding warrants, and inspecting the car's registration and insurance.  *Rodriguez*, 135 S.Ct. at 1615.

Police may, however, extend an otherwise-completed traffic stop, including to conduct a dog-sniff, if, during the initial traffic stop, the officer develops a "reasonable suspicion" that the individual is engaged in other criminal activity.  *Rodriguez*, 135 S.Ct. at 1612, 1615.  In determining whether reasonable suspicion exists such that a traffic stop can be extended, the officer "may consider a series of acts which are innocent in themselves, but which, taken together, warrant further investigation."  *United States v. Robinson*, 58 M.J. 429, 433 (C.A.A.F. 2013).  The Supreme Court has defined "reasonable suspicion" as a "particularized and objective basis for suspecting" criminal conduct under a totality of the circumstances.  *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990).

Here, the defense did not dispute that the initial traffic stop was lawful at its outset and that the officer had probable cause to believe the appellant had committed a traffic violation.  The appellant contends, however, that the officer unreasonably prolonged the duration of that stop without reasonable suspicion that she was involved in other criminal conduct.  We disagree.

First, the original traffic stop was not complete at the time the canine unit arrived and performed the dog-sniff.  The canine unit arrived and conducted the dog-sniff less than six minutes after the traffic stop began.  At that time, Officer RS still had not completed the tasks related to issuing a traffic ticket, as he was still awaiting the results

of the out-of-state license check.  Also, there is no evidence the officer was not diligently pursuing the investigation into the traffic violation.   Given this, we conclude that the traffic stop was not extended in order to conduct the dog-sniff, and the authority for the seizure had not ended at the time it occurred.

Second, even if the traffic stop was extended beyond the time reasonably required to effectuate its purpose, Officer RS reasonably suspected that the appellant was engaged in criminal conduct relating to illegal drugs, based on a series of acts and observations. During his initial conversation with the appellant after pulling her over for speeding, the officer observed suspicious behaviors and indications of additional criminal activity.  She appeared disheveled and nervous, her eyes were not fully open, her hands shook and her speech was impaired.  When asked if she had drugs, the appellant glanced at her car in a manner the officer deemed suspicious.  She was also traveling to an area with a reputation for drug activity.   In light of this and the totality of the remaining circumstances, we conclude the officer had a particularized and objective basis to suspect the appellant was involved with illegal drugs.   Given this reasonable suspicion of criminal activity beyond the traffic violation, Officer RS would have been constitutionally authorized to extend his traffic stop in order to conduct the dog-sniff.

## II.  Lawfulness of the Dog-Sniff

Soon after the canine unit arrived, Officer MT told the appellant that Stryker was going to do a sniff around the vehicle.  They started at the passenger's side headlight and worked counterclockwise.  When Stryker got to the driver's door, Officer MT noticed a change in his breathing.  As the officer continued walking around the car, the dog "went high," meaning he reached his paws up the side of the car to get his nose closer to the open window.   Officer MT did not facilitate or encourage the dog to engage in this behavior.

Stryker then "squared off" on the car and sat down, exhibiting the behavior he had been trained to display when detecting the odor of contraband.  Based upon his training and experience in working with the dog, Officer MT believed Stryker had detected the odor of an illegal drug emanating from the open car window.  Following this alert, which occurred four minutes after the canine unit arrived on scene and ten minutes after the traffic stop was initiated, Officer MT returned Stryker to his police vehicle.

Based upon the dog's alert, Officer RS believed he now had probable cause to search the appellant's car.  He opened the passenger side door and smelled the odor of marijuana.  Inside a hydration pack, Officer RS found two glass pipes and a substance that was later tested and confirmed to be marijuana.

As Officer RS was searching the car, the appellant admitted to one of the other officers that she indeed had a small amount of marijuana in the car for her personal use.

The appellant was taken to a local jail where, during in-processing, she removed a glass jar containing 5.9 grams of marijuana and a baggie containing 3.7 grams of marijuana from inside her pants.

At trial, the appellant moved to suppress the evidence obtained after the traffic stop on grounds the police officers conducted an unauthorized search of the car's interior, in violation of the Fourth Amendment. The military judge denied the motion to suppress. We review a military judge's ruling on a motion to suppress for an abuse of discretion. *Rodriguez*, 60 M.J. 239 at 246. We review his factfinding under the clearly-erroneous standard and conclusions of law under the de novo standard. *Id.* In issuing his ruling, the military judge made extensive findings of fact, most of which the appellant does not contest on appeal and which are summarized above.

A dog-sniff performed on the exterior of a car during a lawful traffic stop does not amount to a "search" under the Fourth Amendment. *Caballes*, 543 U.S. at 410; *Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (stating that a dog-sniff of the exterior of a car is "much less intrusive than a typical search") (internal quotation marks and citation omitted). The appellant primarily takes issue with the military judge's conclusion that the dog "did not extend his nose into the passenger compartment" through the open window and thus the dog-sniff occurred on the exterior of the car. The appellant insists that Stryker's nose and paws broke the plane of the driver's window—amounting to an "intrusion into the interior of the vehicle—prior to the dog's alerting; thereby violating the appellant's reasonable expectation of privacy without probable cause." She contends that the police "learned what they learned only by physically intruding upon the interior of [the] vehicle while simultaneously engaged in an attempt to find something or obtain information." We are not persuaded.

We have carefully reviewed the record of trial, to include the dashboard video. We find no error in the military judge's findings and conclusions on this issue. The military judge acknowledged Officer MT's testimony that the dog's head may have entered the compartment but concluded, following his own review of the recording, that the dog's nose did not break the plane of the open window. This factual finding is supported by the recording and therefore we cannot find it to be clearly erroneous. *See United States v. Jones*, 73 M.J. 357, 362 (C.A.A.F. 2014). We also agree with the military judge's conclusion that the dog's behavior changed as soon as he walked near the open driver's window, indicating that he had detected the odor of contraband even before he placed his front paws on the door.

Even were we to agree with the appellant that the dog's nose and paws encroached upon the interior of the vehicle before he alerted, we would not conclude the search was illegal. Instead, we concur with the Federal Circuit courts who have concluded the Fourth Amendment is not violated when a police canine sniffs inside an already open car window or trunk when not directed to do so by the handler. *See United States v. Sharp*,

689 F.3d 616, 620 (6th Cir. 2012); *United States v. Pierce*, 622 F.3d 209, 214-16 (3d Cir. 2010); *United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989). In this case, the appellant voluntarily left her window open when she exited her car, and Stryker's physical interaction with the car was spontaneous and not directed by law enforcement. Under these circumstances, we find no Fourth Amendment violation.

## III. Referral of Charges

As noted above, the three sets of charges in this case—the UA charge, the Ohio charges, and the SrA B charges—were referred to trial on 21 December 2012. The appellant does not challenge the validity of this referral. However, she contends that—in the wake of the military judge's rulings severing the LSD possession specification and directing re-investigation of all SrA B charges—the UA charge and the Ohio charges were effectively withdrawn and later re-referred for improper reasons. The military judge addressed this claim at trial, finding it to be without merit. In doing so, the judge determined that the UA charge and the Ohio charges were never withdrawn from the GCM to which they had been referred on 21 December 2012, and there was thus no issue as to the validity of their referral. We agree.[8]

> Referral of charges requires three elements: a convening authority who is authorized to convene the court-martial and is not disqualified (*see* R.C.M. 601(b) and (c)); preferred charges which have been received by the convening authority for disposition (*see* R.C.M. 307 as to preferral of charges and Chapter IV as to disposition); and a court-martial convened by that convening authority or a predecessor (*see* R.C.M. 504).

*United States v. King*, 28 M.J. 397, 399 (C.M.A. 1989).

We review de novo whether the withdrawal of charges and re-referral to another court-martial was for a proper reason. *See United States v. Underwood*, 47 M.J. 805, 809 (A.F. Ct. Crim. App. 1997) (citing *United States v. Koke*, 34 M.J. 313 (C.M.A. 1992)). We review the military judge's factfinding under the clearly-erroneous standard and his conclusions of law under the de novo standard. *See United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995) (citations omitted).

Prior to the resumption of trial on 4-6 November 2013, and during the hiatus that followed the trial judge's severing the LSD charge and ordering a re-investigation of the

---

[8] The government argues that, by pleading guilty, the appellant has waived the right to raise improper referral on appeal. Assuming arguendo that the issue is not waived, we nevertheless find it to be without merit.

SrA B charges, several things occurred. Among them was a new Article 32, UCMJ, Investigation of the SrA B charges, with a report dated 12 August 2013.[9] The UA charge and the Ohio charges were not addressed during this new Article 32, UCMJ, Investigation, and afterward there was some confusion among the parties as to their status. Even the judge advocates serving the special and general court-martial convening authorities appeared to misunderstand whether the UA charge and the Ohio charges had been withdrawn from the GCM to which they had initially been referred. Indeed, on 5 September 2013, an assistant staff judge advocate assigned to the GCM headquarters signed a "flap" to the charge sheet, dated 19 November 2012, purporting to re-refer the UA charge, the Ohio charges, and the SrA B charges to the court-martial previously convened.[10]

When trial resumed, the military judge addressed this confusion regarding the status of the charges. In doing so, he made detailed findings of fact, and ultimately concluded that "the convening authority did not withdraw the [SrA B] (or other remaining) charges. Therefore, the Court need not determine whether the [SrA B] (or all remaining) charges were re-referred." Having carefully reviewed the record of trial ourselves, we agree that the charges now before us were never withdrawn from the GCM to which they were referred on 21 December 2012, and that no re-referral occurred nor was necessary.

In addition to disputing the trial judge's finding that the charges were never withdrawn, the appellant alleges that the charges in this case were "re-referred for an improper reason." Suggesting that the government "manipulated the referral process" in order to deny her the discovery of evidence to which she was entitled and to gain an "unfair tactical advantage," the appellant contends she was the victim of unlawful command influence (UCI). In reviewing the record, we concur with the military judge that the government's processing of this case was not well-managed and "hardly a model to be emulated." We also agree with him, however, that there is no evidence of unlawful command influence, bad faith, or other such impropriety on the part of the government. We therefore reject this argument.[11]

---

[9] In addition to the SrA B charges, the Article 32 IO investigated yet another (or fourth set) of charges, preferred on 3 June 2013. The 3 June 2013 charges were ultimately not referred to trial by the convening authority and are not material to any issue we address in this appeal.

[10] On 5 September 2013, the same assistant staff judge advocate lined through and initialed Specification 4 of Charge III (communicating a threat), indicating that the convening authority intended to withdraw and dismiss that allegation.

[11] We review allegations of unlawful command influence de novo. *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citing *United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006)). Once actual or apparent command influence is properly placed at issue, "no reviewing court may properly affirm findings and sentence unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." *Thomas*, 22 M.J. at 394. The defense has the initial burden of raising the issue of unlawful command influence by presenting "some evidence" of unlawful command influence, meaning the defense "must show facts which, if true, constitute unlawful command influence." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999); *Salyer*, 72 M.J. at 423. This "burden of showing potential unlawful command influence is low, but

*IV. Sentence Severity*

The appellant contends that the portion of her sentence calling for dismissal is unduly severe. She argues that her misconduct was relatively minor, as it involved only marijuana. She claims to have taken responsibility through her plea of guilty and points to a history of physical and mental disorders, arguing the "evidence calls for mercy and understanding in evaluating the appropriateness of her sentence."

This court reviews sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006); *United States v. Baier*, 60 M.J. 382, 383–84 (C.A.A.F. 2005). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine[], on the basis of the entire record, should be approved." Article 66(c), UCMJ. "We assess sentence appropriateness by considering the appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial." *United States v. Bare*, 63 M.J. 707, 714 (A.F. Ct. Crim. App. 2006), *aff'd*, 65 M.J. 35 (C.A.A.F. 2007); *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982). While we have a great deal of discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999); *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A. 1988).

It is correct that the appellant's conviction involved only marijuana. The circumstances of that involvement were, however, aggravated. Hers was more than a one-time abuse. The defense's own expert testified that the appellant engaged in a "maladaptive pattern" of marijuana use. The very night her original UA charge was referred to trial, the appellant was caught up in the Ohio drug activity. By her own admission, she was consciously traveling to a recreation area known for drug use and music raves. Civilian police and staff witnessed an officer of the Air Force engage in deceptive acts, including the concealment of contraband in a hydration pack and within the crotch and buttocks areas of her pants.

Furthermore, the evidence at trial suggested the appellant's rehabilitation potential was poor. By the time she was sentenced, she had received two referral officer performance reports, one nonjudicial punishment, two letters of reprimand, and two letters of counseling.

---

is more than mere allegation or speculation." *Salyer*, 72 M.J. at 423 (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)). If raised on appeal, the "appellant must show (1) facts which, if true, constitute unlawful command influence; (2) [] the proceedings were unfair; and (3) [] the unlawful command influence was the cause of that unfairness." *Salyer*, 72 M.J. at 423; *Biagase*, 50 M.J. at 150. The burden then shifts to the government, who must prove beyond a reasonable doubt: (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings and sentence. *Biagase*, 50 M.J. at 151.

We have carefully considered the appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial. We find that the appellant's approved sentence, which includes a dismissal, 198 days confinement, and forfeiture of all pay and allowances, was clearly within the discretion of the convening authority, was appropriate in this case, and was not inappropriately severe.

*V. Validity of Adjudged Dismissal*

The court-martial in this case adjourned on 6 November 2013. On 18 February 2014, the convening authority took action, approving the appellant's sentence which included dismissal from the service. On 1 May 2014, while her appeal was pending before this court, Air Force authorities issued a DD Form 214, Certificate of Release or Discharge from Active Duty, purporting to honorably discharge the appellant on the basis of her nonselection for permanent promotion. The appellant urges us to find that her "dismissal cannot be executed, and [recognize] that the dismissal was remitted when she received an administrative discharge prior to its execution." We decline to do so.

The interpretation of service regulations is a question of law we review de novo. *United States v. Manuel*, 43 M.J. 282, 286 (C.A.A.F. 1995). Likewise, "when an accused contests personal jurisdiction on appeal, [we] review that question of law de novo." *United States v. Melanson*, 53 M.J. 1, 2 (C.A.A.F. 2000).

Regardless of the merit of the appellant's claim as to her purported discharge, we retain the authority to address this assignment of error as well as all other aspects of the appeal before us. Our superior court has held that, if a person is discharged administratively while appellate review is pending, there is "no good reason to hold the findings and sentence of the court-martial are impaired by the discharge." *United States v. Speller*, 24 C.M.R. 173, 178 (1957). Further, our superior court has repeatedly indicated that the power of review authorities over the court-martial is unaffected by an administrative discharge. *See United States v. Woods*, 26 M.J. 372 (C.M.A. 1988); *United States v. Jackson*, 3 M.J. 153 (C.M.A. 1977); *United States v. Entner*, 36 C.M.R. 62 (1965); *United States v. Speller*, 24 C.M.R. 173, 178 (1957); *United States v. Sippel*, 15 C.M.R. 50, 54–55 (1954). Indeed, the appellant concedes that her purported discharge "does not affect this Court's ability to review the findings and the sentence[.]" She urges instead that "this Court should hold that [her] dismissal cannot be executed because she has already received her honorable discharge."

The legal landscape for addressing the issue before us was well articulated in *United States v. Watson*, 69 M.J. 415, 416-17 (C.A.A.F. 2011). There, our superior court declared:

> A pretrial administrative discharge terminates court-martial jurisdiction over the accused, returning him to civilian status by virtue of the discharge. A post-trial administrative discharge operates to remit the unexecuted punitive discharge portion of an adjudged court-martial sentence.
>
> A void administrative discharge, such as one obtained by fraud, does not preclude either the exercise of court-martial jurisdiction or the approval of an unexecuted punitive discharge. Likewise, an administrative discharge that is suspended by the express terms of a regulation does not preclude approval of an unexecuted punitive discharge.
>
> For purposes of ascertaining the impact of an administrative discharge on court-martial proceedings, our Court has identified three generally applicable elements of a valid discharge: "'First, there must be a delivery of a valid discharge certificate . . . . Second, there must be a final accounting of pay made . . . . Third, appellant must undergo the 'clearing' process required under appropriate service regulations to separate him from military service.'"

*Id.* at 416-17 (citations omitted).

Thus, the question before us is not one of jurisdiction over the appellant, but whether the issuance of the DD Form 214 served to remit her adjudged dismissal. In accordance with *Watson* and the cases cited therein, we must first consider whether this purported administrative discharge is valid. We do this by addressing the "three generally applicable elements of a valid discharge," namely: (1) was a valid discharge certificate delivered to the appellant, (2) was a final accounting of pay made to her, and (3) did she undergo the clearing process required to separate her from the service. *Id.* at 417.

In considering the record before us, we note that the appellant has provided a copy of the DD Form 214 in question but has not offered any affidavits nor provided any further evidence in support of her assignment of error. The government, on the other hand, has presented affidavits and other documents suggesting that the discharge certificate issued to the appellant was not valid and that the appellant never underwent the clearing process required by service guidelines to separate her from the service.

This leads us to consider whether a fact-finding hearing is necessary to resolve this issue, in accordance with *United States v. DuBay*, 37 C.M.R 411 (1967). When there is a dispute about a factual matter material to a post-trial claim, we need not resort to a

post-trial fact-finding hearing if the alleged errors would not warrant relief even if the factual dispute were resolved in the appellant's favor. United *States v. Ginn*, 47 M.J. 236, 243, 248 (C.A.A.F. 1997). Such is the case here.

Even if we assume the DD Form 214 is valid, we have no evidence from the appellant, or otherwise, that a final accounting of pay was made or that she underwent the clearing process required by service guidelines to separate her from military service. Under these circumstances, we are confident that the *Ginn* framework would have us reject the appellant's claim without ordering a *DuBay* hearing; and we do so now. *See Fagan*, 59 M.J. at 238 (cautioning military law practitioners "that mere submission of post-trial affidavits does not usually require an evidentiary hearing in order to resolve a post-trial collateral claim") (citing *United States. v. Dykes*, 38 M.J. 270, 273 (C.A.A.F. 1993)).

## VI. Recusal of Military Judge

The appellant argues that she was prejudiced by the military judge's refusal to recuse himself from her court-martial. The appellant claims the military judge should have done so because of his reactions to her behavior during her arraignment proceedings. She also claims the military judge should have recused himself because, at the point in the proceedings when the defense moved for recusal, defense counsel anticipated calling the military judge as a fact witness as to matters involving the appellant's pretrial confinement. We reject this assignment of error.[12]

"An accused has a constitutional right to an impartial judge." *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001). "[A] military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." R.C.M. 902(a). When a military judge's impartiality is challenged on appeal, our standard of review is abuse of discretion. *United States v. Burton*, 52 M.J. 223, 226 (C.A.A.F. 2000); *United States v. Reynolds*, 24 M.J. 261, 265 (C.M.A. 1987).

The test is "whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions." *Id.* (citations and internal quotation marks omitted). The test is objective: "any conduct that would lead a reasonable man knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned." *United States v. Kincheloe*, 14 M.J. 40, 50 (C.M.A. 1982) (citations and internal quotation marks omitted). As recusal based on the appearance of bias is intended to promote public confidence in the integrity of the judicial process, what matters is not the reality of bias or prejudice but its appearance. *Hasan v. Gross*, 71 M.J. 416, 418-19 (C.A.A.F. 2012).

---

[12] The government urges that, by her plea of guilty and by the term in her pretrial agreement agreeing to "waive all waivable motions," the appellant has waived the opportunity to raise the recusal issue on appeal. Even assuming waiver does not apply, we find the assignment of error to be without merit.

"While military judges are obliged to disqualify themselves when they lack impartiality, they are equally obliged not to disqualify themselves when there is no reasonable basis for doing so." *Burton*, 52 M.J. at 226 (citation omitted). "There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle, particularly when the alleged bias involves actions taken in conjunction with judicial proceedings." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001).

The 22 March 2013 VTC arraignment of the appellant was scheduled to begin at 0800. However, the start was delayed briefly, until 0804, because the appellant arrived late. Shortly thereafter, when the military judge spoke to the appellant for the first time on the record, she remained seated. In response, the military judge asked, "Would you like to rise when you address the Court, Lieutenant Harrell?" Captain (Capt) PH, who served as defense counsel for the appellant during pretrial and arraignment proceedings and was thereafter released by her, states in an affidavit, "It appeared to me that the military judge was upset by First Lieutenant Harrell's tardiness as well as her perceived lack of decorum in the courtroom." Capt PH noted further:

> After First Lieutenant Harrell released me, the military judge excused me from counsel's table. I remained in the gallery and was present when First Lieutenant Harrell's cell phone rang while she was seated at counsel's table and speaking with the military judge. It appeared to me the military judge was irritated by her cell phone ringing.

Beyond these subjective observations of Capt PH, we find no evidence of hostility on the part of the military judge. The military judge had a duty to maintain the dignity and decorum of the proceedings, and we find no improper impact, real or perceived, upon the appellant's court-martial arising from any response by the trial judge. *See* R.C.M. 801(a)(1)-(2) (stating a military judge shall "ensure dignity and decorum of the proceedings are maintained"); *see also* UNIFORM RULES OF PRACTICE BEFORE AIR FORCE COURTS-MARTIAL (R.P.C.M.) 4.5 (6 June 2013) ("All parties will be punctual for all sessions of the court-martial."); R.P.C.M. 4.9(B) ("All beepers, audible pagers, and cell phones must be turned off prior to entering the courtroom.").

Similarly, we find no merit to the appellant's claim that the military judge was required to recuse himself because he was a potential witness. As noted above, the appellant's arraignment occurred on 22 March 2013. On 28 March 2013, she was placed in pretrial confinement based upon a number of alleged offenses. Among these allegations were claims that she had reported late to her arraignment and had been reprimanded by the military judge for improper etiquette during that proceeding. In a motions hearing held on 17 June 2013 regarding the pretrial confinement decision, the

defense attempted to call the military judge to testify to these matters. The military judge denied this request.

We find that the military judge did not abuse his discretion in denying the defense request that he testify. *See United States v. McElhaney*, 54 M.J. 120, 126 (C.A.A.F. 2000) (stating that a military judge's ruling denying a motion to compel production of a witness is reviewed for an abuse of discretion). Having properly determined that he would not be a witness in the case, any argument that he must recuse himself on the basis of his becoming a witness was thereafter moot.

We find no violation of the appellant's constitutional right to an impartial judge. Taken as a whole in the context of this trial, the court-martial's legality, fairness, and impartiality were not put into doubt by the military judge's actions. A reasonable person observing this court-martial would not question the military judge's impartiality. We hold that the military judge did not abuse his discretion in refusing to recuse himself.

*VII. Role of the Staff Judge Advocate*

As discussed above, we have rejected the appellant's claim that the convening authority withdrew and improperly re-referred charges against her. When the appellant raised this issue at trial, Colonel (Col) SE, the SJA to the general court-martial convening authority, was called to testify regarding the circumstances of the attempted withdrawal and re-referral of certain charges in September 2013. Following that testimony, the military judge sua sponte stated his belief that it would be prudent for Col SE to not provide post-trial advice to the convening authority given his testimony about the charges and specifications.

Col SE subsequently signed the post-trial SJA recommendation (SJAR) provided to the convening authority. The appellant now argues for the first time that Col SE's testimony disqualified him from acting as the SJA and signing the SJAR. The appellant asks this court to order new post-trial processing with a different SJA to advise the convening authority.

Whether an individual is disqualified from serving as the SJA is a question of law we review de novo. *United States v. Taylor*, 60 M.J. 190, 194 (C.A.A.F. 2004). However, the appellant has an "initial burden of making a prima facie case" that the SJA [] served in a disqualifying role. *United States v. Wansley*, 46 M.J. 335, 337 (C.A.A.F. 1997).

R.C.M. 1106(b) states that certain personnel—including court members, military judges, trial and defense counsel, and investigating officers—are disqualified from later acting as SJA to any convening authority in the same case. The Rule's discussion also states that the SJA may be ineligible where the SJA "testified as to a contested matter

(unless the testimony is clearly uncontroverted) . . . ." Our superior court has similarly held that an SJA who testifies as to a contested issue is disqualified from later advising the convening authority as SJA in the case, because "a person who testifies in a case and later has to assess his own testimony is not likely to give it less than absolute credibility and the fullest possible effect." *United States v. Choice*, 49 C.M.R. 663, 665 (C.M.A. 1975). On the other hand, "testifying as to a matter of formality or giving testimony that is uncontroverted does not disqualify the SJA or legal officer." *Wansley*, 46 M.J. at 337. The test to be applied in differentiating the two situations is one of "objective reasonableness"; in other words, "[i]f from [the SJA's] testimony, it appears that he has a personal connection with the case, he may not act as reviewing authority. On the other hand, if his testimony is of an official or disinterested nature only, he may properly review the record." *Choice*, 49 C.M.R. at 665 (quoting *United States v. McClenny*, 18 C.M.R. 131, 137 (C.M.A. 1955)).

Applying this objective reasonableness test to the instant case, we find that Col SE was not disqualified from advising the convening authority in the post-trial review process. A fair reading of his testimony on the defense motion indicates only an official interest in the referral process. His testimony was relatively brief, objective, and straight-forward. Col SE revealed no predisposition as to the issue's outcome. The military judge adopted Col SE's testimony into his findings of fact, indicating there was little factual dispute about the matters to which Col SE testified.[13] Under these circumstances, we find that it was objectively reasonable for Col SE to sign the post-trial recommendation and that the recommendation itself was impartial.

## *Conclusion*

The approved findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ. Accordingly, the approved findings and the sentence are **AFFIRMED**.



FOR THE COURT

STEVEN LUCAS
Clerk of the Court

---

[13] It is worth noting that the matter about which Col SE testified—the re-referral issue—was not raised by the defense in its clemency request.